JOSEPH LEWIS, a Taxpayer of the City of New York, Plaintiff, v. THE BOARD OF EDUCATION OF THE CITY OF NEW YORK, Defendant.

Supreme Court, New York County, October 30, 1935.

*Joseph Wheless,* for the plaintiff.

*Paul Windels, Corporation Counsel,* for the defendant.

COLLINS, J. This motion by the plaintiff challenges the legal sufficiency of the separate defenses.

The plaintiff, as a taxpayer, seeks to forbid the defendant, The Board of Education, from permitting school buildings to be used as assembly places for racial and religious groups, and to restrain reading from the Bible in public schools. The law which authorizes such readings is attacked as unconstitutional.

The amended complaint projects three causes of action. The first asserts that the board of education is illegally allowing the use of school buildings " to a large number of distinctively sectarian religious denominations, societies and groups," among them " many Roman Catholic Newman Clubs, Protestant Young Men's and Young Women's Christian Associations and Hi-Y Clubs, and Hebrew Menorah and Junior Hadassah Clubs." Other Protestant, Jewish and Catholic organizations are enumerated as utilizing the schoolhouses in disregard of law. (Complaint, ¶ IV.)

The second cause attacks, as violative of the Federal and State Constitutions, the use of the Holy Scriptures in the public schools.

The third cause assails as unconstitutional that portion of section 1151 of the Greater New York Charter which prohibits the board of education from excluding " the Holy Scriptures, without note or

comment, or any selections therefrom, from any of the schools provided for by this chapter; but it shall not be competent for the said board of education to decide what version, if any, of the Holy Scriptures, without note or comment, shall be used in any of the schools; provided that nothing herein contained shall be so construed as to violate the rights of conscience, as secured by the constitution of this State and of the United States." ) (Complaint, ¶ XXIV.)

Paragraph X of the answer alleges, as a defense to the first cause of action, that " the so-called sectarian religious denominations, societies, and groups, mentioned and described in  *  *  *  the amended complaint  *  *  *  are not permitted by the defendant, Board of Education of the City of New York, to hold any religious denominational services in any of the public schools under the jurisdiction and control of the defendant and that the aforesaid denominations, societies and groups are only and solely permitted to have meetings in the aforesaid public schools for the purpose of conducting ethical, educational and cultural discourses and lectures for the moral uplift of the pupils in the public schools connected with the said so-called denominations, societies and groups; and the defendant alleges that at no time and for no purpose does it permit any pupil of the aforesaid public schools or the societies and groups to which they belong to use or occupy any public school in the City and City School District of New York for the inculcation of any of the tenets of any religious denomination or for any meeting or purpose, directly or indirectly, in which any denominational tenet or doctrine is taught."

Paragraph XI of the answer, as a defense to the second and third causes of action, alleges that the board of education is a State agency, " charged by the State with the administration of its educational system in the City and City School District of New York, and it stood during all of said times, and it still stands, as a substitute for the City of New York as a corporate agency of the State for the purpose of administering educational matters in the said City; that all funds, raised by taxation by the State of New York for the support of the common schools or by The City of New York, pass to the credit of the Board of Education and they are disbursed upon the audit of the defendant, and the only relation that The City of New York has to the subject of public education is as the custodian and depositary of school funds and the only duty of the said City of New York with respect to the said funds is to keep them safely and disburse the same according to the instructions of the Board of Education; that The City of New York, as trustee, has title to the money, but it is under the care, control and administration of the defendant, Board of Education, and the powers

conferred upon the Board of Education, and the powers conferred upon the said Board of Education to administer the public educational system within the confines of The City of New York are exclusive and the grant of the same to the Board of Education negatives the authority in the Municipality to exercise like powers; that a taxpayer's action brought under the provisions of Section 51 of the General Municipal Law, which authorizes such actions against only municipal corporations and their officers, will not lie and cannot be maintained against the defendant, a branch of the State Government, and the corporate agency of the State established for the purpose of administering educational matters of the State in The City of New York, and the defendant alleges that this action will not lie and cannot be maintained against it to obtain the relief prayed for in the amended complaint."

Paragraph XII of the answer asserts a second defense to the second and third causes by averring " that the practice of singing hymns in the public school assemblies has never been universal and is declining rapidly, and that the reading of portions of the Bible or Bibles, mentioned in the amended complaint, without note or comment, at the opening exercises in the public schools of The City of New York is regular and lawful and not in violation of any provision of the Constitution of the State of New York or the Constitution of the United States or of any statute, but is duly permitted by and in accordance with the provisions of the said Constitutions and statute."

It is the validity of these defenses that this motion poses.

No merit attaches to the board's preliminary objection that the motion is tardy.

Section 279 of the Civil Practice Act provides that " an objection * * * that a defense is insufficient in law upon the face thereof," is " not waived by failure to raise the same before trial."

Let it be emphasized that the concern here is with power, not policy. Within the boundaries of law what shall and shall not be done in the public schools is an educational function to be determined by those intrusted with the conduct and administration of the public schools. (*Lewis* v. *Board of Education of City of New York*, 258 N. Y. 117.) The question here is not whether the Bible shall or shall not be read in the public schools; it is not whether permission to utilize the school buildings should be given or withheld from those of racial or religious affiliations. The board has resolved these questions of policy. The query here is whether the board, in causing excerpts from the Bible to be read, and in allowing school buildings to be employed in the assailed fashion, is transgressing a constitutional guaranty, or is violating any other provision or concept of law.

Undisguised, the plaintiff's attack is on a belief and trust in God and in any system or policy or teaching which enhances or fosters or countenances or even recognizes that belief and trust. Such belief and trust, however, regardless of one's own belief, has received recognition in State and judicial documents from the earliest days of our Republic.

Thus, the Declaration of Independence concludes with the riveting words: "And for the support of this declaration, with a firm reliance on the protection of Divine Providence, we mutually pledge to each other our lives, our fortunes, and our sacred honor."

" In God We Trust " has become an American aphorism, stamped on our coins.

And our State Constitution opens with the words, " We, The People of the State of New York, grateful to Almighty God for our Freedom, in order to secure its blessings, Do Establish this Constitution."

Nor have the courts ignored the existence of this declared policy.

In *People ex rel. Lewis* v. *Graves* (219 App. Div. 233, 238) it was said: "A belief in religion is not foreign to our system of government."

Our highest court, in *Holy Trinity Church* v. *United States* (143 U. S. 457, 465), said: " this is a religious people. This is historically true. From the discovery of this country to the present hour, there is a single voice making this affirmation."

These quotations are not intended to convey the thought that State and Church should be brought into closer harmony. Their separation is a fundamental of immutable virility. Nor do the excerpts indicate the approval or proposal of a policy that religion be taught in the public schools. The principle that religion has no place in public temporal education is so inexorable that a reaffirmation of it would be supererogatory.

These concepts are not repugnant to the constitutional guaranty which safeguards freedom of conscience and of worship and the free entertainment and pursuit of religious beliefs. They are not hostile to section 3 of article 1 of the State Constitution which declares that " The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this State to all mankind."

With the foregoing as a setting, the adequacy of the defenses is examined.

(1) As noted, the first defense answers the charge that the school buildings are being unlawfully used and alleges that the assailed gatherings are in no sense sectarian or religious or denominational.

It seems to me that this defense pleads the law.

Section 455 of the Education Law, which covers the " Use of schoolhouse and grounds out of school hours," provides:

" Schoolhouses and the grounds connected therewith and all property belonging to the district shall be in the custody and under the control and supervision of the trustees or board of education of the district. The trustees or board of education may adopt reasonable regulations for the use of such schoolhouses, grounds or other property, when not in use for school purposes, for such other public purposes as are herein provided. Such regulations shall not conflict with the provisions of this chapter and shall conform to the purposes and intent of this section and shall be subject to review on appeal to the commissioner of education as provided by law. The trustees or board of education of each district may, subject to regulations adopted as above provided, permit the use of the schoolhouse and rooms therein, and the grounds and other property of the district, when not in use for school purposes, for any of the following purposes:

" 1. By persons assembling therein for the purpose of giving and receiving instruction in any branch of education, learning or the arts. * * *

" 3. For holding social, civil and recreational meetings and entertainments, and other uses pertaining to the welfare of the community; but such meetings, entertainment and uses shall be nonexclusive and shall be open to the general public.

" 4. For meetings, entertainments and occasions where admission fees are charged, when the proceeds thereof are to be expended for an educational or charitable purpose; but such use shall not be permitted if such meetings, entertainments and occasions are under the exclusive control, and the said proceeds are to be applied for the benefit of a society, association or organization of a religious sect or denomination, or of a fraternal, secret or exclusive society or organization other than organizations of veterans of the military, naval and marine service of the United States and organizations of volunteer firemen."

We see, therefore, that, as education is, and must be, comprehensive, so the above language of subdivision 1 of section 455 is elastic.

The manifest vice of the plaintiff's position is that he has confused the racial and religious affiliations of the *users* of the school buildings with the *purpose* for which the buildings are used. The restrictions relate to the *use*. In this land where all races and creeds are equal before the law, regardless of color or religion, the doors of the schools should not be shut in the faces of those who by birth or otherwise belong to a particular race or adhere to a particular

religion. / Indeed, by opening the doors to all, the school authorities more honestly and faithfully cling to the enduring principles of our free institutions, and more sincerely and indiscriminately sustain the constitutional guaranties, than do those who would deny admission to certain persons because of creed or racial solidarity. The sanctified principle of freedom of religious belief does not distinguish between believers and non-believers. It embraces both, and accords one as much protection and freedom as the other. A sect or tenet which is intolerant of those of a different sect or tenet is the precise antithesis of religious liberty. Freedom is negated if it does not comprehend freedom for those who believe as well as those who disbelieve. The law is astute and zealous in seeing to it that all religious beliefs or disbeliefs be given unfettered expression. Authentic free thinking involves the indubitable right to believe in God, as well as the unfettered license not to believe or to disbelieve in a Deity.

To examine into the sectarianism of those seeking access to public school buildings would make a travesty of our glorified liberty of conscience. Liberty for non-believers in God, but denial to believers in a Deity, would be a mock liberty.

Rather than inimical to the educational policy of the State, or subversive of legitimate use, it is a wholesome thing to have the school buildings, which are maintained at large expense by the taxpayers, used for the purposes and by the groups whose exclusion is here sought.

It is the *use* to which the school buildings are put, and not the *identity* of the users, that is decisive of the lawfulness of the use.

Manifestly, therefore, the defense set forth in paragraph X of the answer, to the effect that the school buildings are being used for the purpose of giving and receiving instruction in education, learning and the arts, is legally sufficient.

(2) The second challenged defense is contained in paragraph XI and, as observed, is aimed at the second and third causes of action. This defense states, in effect, that a taxpayer's action is not maintainable to interfere with expenditures in connection with the educational policies adopted and pursued by the board of education.

Section 51 of the General Municipal Law authorizes a taxpayer to institute an action to restrain officers of municipal corporations " to prevent any illegal official act * * * or to prevent waste or injury to * * * property, funds or estate of such * * * municipal corporation."

The defendant contends that inasmuch as the waste and illegal acts here complained of are by State officers, a taxpayer's action will not lie. Subdivision 7 of section 877 of the Education Law

divides school funds into general or special. "All moneys raised for the payment of the salaries of all persons employed in the supervising and teaching staff " constitute the general school fund, and all other funds not embraced in the general fund constitute the special fund. The answer says that since the purchase of Bibles is made from funds which come in part from the State, a taxpayer's action may not enjoin the expenditure.

The Court of Appeals, in *Lewis* v. *Board of Education of City of New York (supra)*, held: " In so far as the Board acts under the Education Law in establishing school districts, rules and regulations for scholars and teachers, grades and examinations, studies and hours of studies, the Board and its members act as officers of the State." (Citing cases.) Further, that " Section 51 of the General Municipal Law cannot, in the absence of waste or illegal expenditures, be used to enjoin the educational functions of the State." This implies that where waste or illegality is present, a taxpayer's action under section 51 may be maintained. But the implication would seem to antagonize previous rulings of that court.

Thus, in *Gunnison* v. *Board of Education* (176 N. Y. 11, 17) it was said: " The only relation that the city has to the subject of public education is as the custodian and depositary of school funds, and its only duty with respect to that fund is to keep it safely and disburse the same according to the instructions of the board of education. The city as trustee has title to the money, but it is under the care, control and administration of the board of education." (Also: *People ex rel. Wells & Newton Co.* v. *Craig*, 232 N. Y. 125; *Matter of Brennan* v. *Board of Education*, 245 id. 8.)

The charge that the expenditures for Bibles is illegal is so interwoven with the exercise of educational functions that paragraph XI of the answer, which covers both, should not be stricken out. This conclusion is not to be construed as a determination that the plaintiff is without right to maintain the action. Let the trial reveal whether the plaintiff's second and third causes seek a stoppage of waste and a restraint of the performance of illegal acts or whether the acts complained of were and are being committed as officers of the State, " enforcing a state function." (*Lewis* v. *Board of Education of City of New York, supra.*)

(3) This brings us to the final challenged defense advanced in paragraph XII of the answer, and which is interposed as a defense to the second and third causes of action. That defense relies upon section 1151 of the Greater New York Charter. The section reads: " Religious sects and dogmatic books excluded; Bible retained. No school shall be entitled to or receive any portion of the school moneys in which religious doctrines or tenets of any particular

Christian or other religious sect shall be taught, inculcated or practiced, or in which any book or books, containing compositions favorable or prejudicial to the particular doctrines or tenets of any particular Christian or other religious sect shall be used, or which shall teach the doctrines or tenets of any other religious sect, or which shall refuse to permit the visits and examinations provided for in this chapter. But nothing herein contained shall authorize the board of education or the school board of any borough to exclude the Holy Scriptures, without note or comment, or any selections therefrom, from any of the schools provided for by this chapter; but it shall not be competent for the said board of education to decide what version, if any, of the Holy Scriptures, without note or comment, shall be used in any of the schools; provided that nothing herein contained shall be so construed as to violate the rights of conscience, as secured by the constitution of this State and of the United States."

Pursuant to the authority invested in the board by the above section and the board's interpretation of it, the board " has provided a large stock of Bibles, and portions of the following editions of the Bible are so read to the pupils in the regular assemblies of all public schools in the city of New York under the jurisdiction of the defendant, to wit: the Douay Version (Roman Catholic), King James Version (Protestant), Bible Readings, International Bible (authorized version), besides portions from the translation of the Bible in Hebrew by Isaac Lesser, in certain instances." (Complaint, ¶ XXV.)

The claim is that though the reading of these Bibles is authorized by section 1151 of the charter, the provisions of that section are repugnant to each other and " meaningless, unintelligent, self-contradictory, and incapable of rational interpretation and application." Further, the charge is made " That the said Bible, and said diverse versions of Bibles are partisan sectarian religious books, used by said divergent and hostile sects solely for the purpose of inculcating and teaching sectarian religious doctrines, dogmas and tenets; that their use in the public schools tends to and does, and is intended to teach and inculcate in the children attending the said schools, the principles of sectarian religious beliefs and worship, all which is forbidden by Constitution and law, and is repugnant to the constitutional principle of separation of State and Church in this State, and of the equality of all children in the secular public schools of this City and State." (Complaint, ¶ XXVI-A.)

Though it is not claimed that the board has not scrupulously adhered to the letter and spirit of section 1151, it is the plaintiff's thesis that any hymn singing or reading from the Scriptures, regardless of the hymn or version, is illegal.

To this notion of unconstitutionality of the challenged portion of section 1151 I cannot subscribe.

Legislative enactments " are presumed to be within its constitutional authority unless the contrary clearly appears. In construing a statute ' if two constructions be permissible, then the one making the act valid must be adopted.' (*Matter of McAneny* v. *Board of Estimate, etc.*, 232 N. Y. 377, 389.) " (*Schieffelin* v. *Goldsmith*, 253 id. 243, 249.)

Indeed, by incorporating the cardinal policy that " nothing herein contained shall be so construed as to violate the rights of conscience, as secured by the Constitution of this State and of the United States," the challenged clause reaffirms the very principle which the plaintiff insists section 1151 violates. How, then, can it be unconstitutional? Section 1151 has been the unchallenged and unabrogated law of this State since 1851 (Laws of 1851, chap. 386, § 18). Progress often demands innovation. The mutations of the times call for the discarding of outmoded policies. Antiquities are jettisoned for improvements. But these axioms are harnessed to the admonition that " We do not readily overturn the settled practice of the years." (*Story* v. *Craig*, 231 N. Y. 33, 40.)

Though the legality of the practice here attacked has never been determined by the courts of this State, it has received judicial sanction elswhere.

In *Commonwealth on complaint of Wall* v. *Cooke* ([Mass.] 7 Am. L. Reg. 417) it was stated: " [Such constitutional provision] was intended to prevent persecution by punishing for religious opinions. The Bible has long been in our common schools * * *. It was placed there as the book best adapted from which to ' teach children and youth the principles of piety, justice, and a sacred regard for truth, love to their country, humanity, and a universal benevolence, sobriety, moderation, and temperance * * *.' But, in doing this, no scholar is requested to believe it, none to receive it as the only true version of the laws of God. The teacher enters into no argument to prove its correctness, and gives no instructions in theology from it. To read the Bible in schools for these and like purposes, or to require it to be read without sectarian explanations, is no interference with religious liberty."

In accord with the Massachusetts holding are: *Kaplan* v. *Independent School District of Virginia* (171 Minn. 142; 214 N. W. 18, 21); *Church* v. *Bullock* (104 Tex. 1; 109 S. W. 115, 118); *Pfeiffer* v. *Board of Education of Detroit* (118 Mich. 560; 77 N. W. 250, 253); *State ex rel. Freeman* v. *Scheve* (65 Neb. 876; 93 N. W. 169, 172); *Spiller* v. *Woburn* (12 Allen, 127, 129).

True, there are contrary expressions. (*Board of Education* v. *Minor*, 23 Ohio St. 211; *State ex rel. Weiss* v. *District Board*, 76 Wis. 177; 44 N. W. 967; *People ex rel. Ring* v. *Board of Education*, 245 Ill. 334; 92 N. E. 251; *Herold* v. *Parish Board of School Directors*, 136 La. 1034; 68 So. 116; *State ex rel. Dearle* v. *Frazier*, 102 Wash. 369; 173 Pac. 35; *State ex rel. Finger* v. *Weedman*, 55 So. Dak. 343; 226 N. W. 348; *State ex rel. Clithero* v. *Showalter*, 159 Wash. 519; 293 Pac. 1000.)

It seems to me, however, that the Massachusetts authority conforms to the policy of our own State as expressed since 1851 in section 1151 of the charter.

In no sense does the practice of reading from the Scriptures destroy or weaken or affect the cleavage between Church and State; the practice does not bridge or conjoin the two. It does not appear that public moneys are being appropriated or expended " in aid or maintenance * * * of any school * * * wholly or in part under the control or direction of any religious denomination, or in which any denominational tenet or doctrine is taught." (State Const. art. 9, § 4.) Nor is it shown that the practice runs counter to the " free exercise and enjoyment of religious profession and worship, without discrimination or preference," safeguarded by section 3 of article 1 of our State Constitution.

It is not urged that any particular sect or religion or Biblical version is being taught or insinuated. It is not maintained that dogmatic religion is being foisted upon any pupil. No special creed or sect or tenet is favored.

Even those who do not accept the Bible as an accurate historical chronicle, enthusiastically regard it as possessing rare and sublime literary qualities. Suppose it were read in the English class as an example of pure English? Suppose that instead of readings from the Bible there were readings from Shakespeare or Keats or Shelley, or Voltaire or Thomas Paine? It would be treading upon explosive ground for the courts to essay a regime for the public schools. Are the courts to dictate what shall and shall not be read in the public schools? Is the curriculum of the public schools to be subject to judicial supervision and review? Are the courts to usurp the educational functions vested in the board of education? The answers reside in the queries. And the answers resolve that the motion to strike out the defenses be, and it is, in all respects, denied.