7 N.J. Super. 442 (1950)
71 A.2d 732
DONALD R. DOREMUS AND ANNA E. KLEIN, PLAINTIFFS,
v.
BOARD OF EDUCATION OF THE BOROUGH OF HAWTHORNE, NEW JERSEY, AND THE STATE OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided February 20, 1950.
*443 Mr. Heyman Zimel, attorney for plaintiffs.
Mr. Alexander E. Fasoli, attorney for defendant, Board of Education of the Borough of Hawthorne, New Jersey.
*444 Mr. Theodore D. Parsons, Attorney General of New Jersey, attorney for defendant, State of New Jersey.
Messrs. Parker, McCay & Criscuolo, attorneys for State Council of the Junior Order of United American Mechanics of the State of New Jersey, as amicus curiae.
DAVIDSON, A.J.S.C.
This action seeks to test the constitutionality of the provisions of the Laws of New Jersey with respect to religious services or exercises in the public schools of the state, and is presented for determination upon cross-motions for summary judgment on the pleadings. The statutes under attack are N.J.S.A. 18:14-77:
"Reading Bible at opening of school.
"At least five verses taken from that portion of the Holy Bible known as the Old Testament shall be read, or caused to be read, without comment, in each public school classroom, in the presence of the pupils therein assembled, by the teacher in charge, at the opening of school upon every school day, unless there is a general assemblage of the classes at the opening of the school on any school day, in which event the reading shall be done, or caused to be done, by the principal or teacher in charge of the assemblage and in the presence of the classes so assembled."
and N.J.S.A. 18:14-78:
"Religious services or exercises.
"No religious service or exercise, except the reading of the Bible and the repeating of the Lord's Prayer, shall be held in any school receiving any portion of the moneys appropriated for the support of public schools."
Plaintiffs shortly contend that compliance with the statutes constitutes religious education and services in aid of one or more religions and in preference of one or more religions over others, and in that public funds and taxes are authorized to support religious activities and institutions and for the purpose of teaching and practicing religion, and so contravenes the First and Fourteenth Amendments to the Constitution of the United States, which read as follows:

*445 "ARTICLE I

"RIGHT OF CONSCIENCE, FREEDOM OF THE PRESS, &C.
"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

"ARTICLE XIV

"CITIZENS AND THEIR RIGHTS

"Section I
"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."
The facts are not in dispute. Plaintiff Doremus is a citizen and taxpayer of the Township of Rutherford, New Jersey, and plaintiff Klein is a citizen and taxpayer of the Borough of Hawthorne, New Jersey, and the mother of Gloria Klein, a student in the Hawthorne High School, which is a public school operated by the Board of Education and supported by public funds appropriated by the State and by said Borough. Defendant Board of Education is complying with the laws and, although rules promulgated and directives issued by it permit any student to be excused from the classroom upon request when the Bible is read or the Lord's Prayer recited, no such request has ever been made by plaintiff Klein or her daughter. The matter, therefore, is submitted to the Court solely on the question of constitutionality, and appears to be of novel impression.
Although there is a diversity of opinion in the State courts as to statutes specifically permitting or requiring the Bible to be read in public schools, the great weight of authority generally seems to hold that such statutes do not contravene the provisions of the several state Constitutions.
That we are fundamentally a religious people is beyond dispute. An excellent review of the American organic utterances which speak the voice of the entire people, and which affirm and reaffirm that this is a religious nation, appears in *446 Church of the Holy Trinity v. United States, 143 U.S. 457, wherein the Court said:
"But beyond all these matters no purpose of action against religion can be imputed to any legislation, state or national, because this is a religious people. This is historically true. From the discovery of this continent to the present hour, there is a single voice making this affirmation. The commission to Christopher Columbus, prior to his sail westward, is from `Ferdinand and Isabella, by the grace of God, King and Queen of Castile,' etc., and recites that `it is hoped that by God's assistance some of the continents and islands in the ocean will be discovered,' etc. The first colonial grant, that made to Sir Walter Raleigh in 1584, was from `Elizabeth, by the grace of God, of England, Fraunce and Ireland, queene, defender of the faith,' etc.; and the grant authorizing him to enact statutes for the government of the proposed colony provided that `they be not against the true Christian faith nowe professed in the Church of England.' The first charter of Virginia, granted by King James I in 1606, after reciting the application of certain parties for a charter, commenced the grant in these words: `We, greatly commending, and graciously accepting of, their Desires for the Furtherance of so noble a Work, which may, by the Providence of Almighty God, hereafter tend to the Glory of his Divine Majesty, in propagating of Christian Religion to such people, as yet live in Darkness and miserable Ignorance of the true Knowledge and Worship of God, and may in time bring the Infidels and Savages, living in those parts, to human Civility, and to a settled and quiet Government; DO, by these our Letters-Patents, graciously accept of, and agree to, their humble and well-intended Desires.'
"Language of similar import may be found in the subsequent charters of that colony, from the same king, in 1609 and 1611; and the same is true of the various charters granted to the other colonies. In language more or less emphatic is the establishment of the Christian religion declared to be one of the purposes of the grant. The celebrated compact made by the Pilgrims in the Mayflower, 1620, recites: `Having undertaken for the Glory of God, and Advancement of the Christian Faith, and the Honour of our King and Country, a Voyage to plant the first Colony in the northern Parts of Virginia; Do by these Presents, solemnly and mutually, in the Presence of God and one another, covenant and combine ourselves together into a civil Body Politick, for our better Ordering and Preservation, and Furtherance of the Ends aforesaid.'
"The fundamental orders of Connecticut, under which a provisional government was instituted in 1638-1639, commence with this declaration: `Forasmuch as it hath pleased the Allmighty God by the wise disposition of his divyne pruidence so to Order and dispose of things that we the Inhabitants and Residents of Windsor, Hartford and Wethersfield are now cohabiting and dwelling in and uppon the river of Conectecette and the Lands thereunto adjoyneing; And well knowing where a people are gathered together the word of God requires *447 that to mayntayne the peace and union of such a people there should be an orderly and decent Government established according to God, to order and dispose of the affayres of the people at all seasons as occasion shall require; doe therefore assotiate and conjoyne our selves to be as one Publike State or Comonwelth; and doe, for our selves and our Successors and such as shall be adjoyned to us att any tyme hereafter, enter into Combination and Confederation together, to mayntayne and presearve the liberty and purity of the gospell of our Lord Jesus woh we now prfesse as also the disciplyne of the Churches, woh according to the truth of the said gospell is now practised amongst us.'
"In the charter of privileges granted by William Penn to the province of Pennsylvania, in 1701, it is recited: `Because no people can be truly happy, though under the greatest Enjoyment of Civil Liberties, if abridged of the Freedom of their Consciences, as to their Religious Profession and Worship; And Almighty God being the only Lord of Conscience, Father of Lights and Spirits; and the Author as well as object of all divine Knowledge, Faith and Worship, who only doth enlighten the Minds, and persuade and convince the Understandings of People, I do hereby grant and declare,' etc.
"Coming nearer to the present time, the Declaration of Independence recognizes the presence of the Divine in human affairs in these words: `We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness.' `We, therefore, the Representatives of the United States of America, in General Congress, Assembled, appealing to the Supreme Judge of the world for the rectitude of our intentions, do, in the Name and by Authority of the good People of these Colonies, solemnly publish and declare,' etc.; `And for the support of this Declaration, with a firm reliance on the Protection of Divine Providence, we mutually pledge to each other our Lives, our Fortunes, and our sacred Honor.'
"If we examine the constitutions of the various States we find in them a constant recognition of religious obligations. Every constitution of every one of the forty-four States contains language which either directly or by clear implication recognizes a profound reverence for religion and an assumption that its influence in all human affairs is essential to the well being of the community. This recognition may be in the preamble, such as is found in the constitution of Illinois, 1870: `We, the people of the State of Illinois, grateful to Almighty God for the civil, political and religious liberty which He hath so long permitted us to enjoy, and looking to Him for a blessing upon our endeavors to secure and transmit the same unimpaired to succeeding generations.' etc.
"It may be only in the familiar requisition that all officers shall take an oath closing with the declaration `so help me God.' It may be in clauses like that of the constitution of Indiana, 1816, Article XI, section 4: `The manner of administering an oath or affirmation shall be such as is most consistent with the conscience of the deponent, *448 and shall be esteemed the most solemn appeal to God.' Or in provisions such as are found in Articles 36 and 37 of the Declaration of Rights of the Constitution of Maryland, 1867: `That as it is the duty of every man to worship God in such manner as he thinks most acceptable to Him, all persons are equally entitled to protection in their religious liberty; wherefore, no person ought, by any law, to be molested in his person or estate on account of his religious persuasion or profession, or for his religious practice, unless, under the color of religion, he shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others in their natural, civil or religious rights; nor ought any person to be compelled to frequent or maintain or contribute, unless on contract, to maintain any place of worship, or any ministry; nor shall any person, otherwise competent, be deemed incompetent as a witness, or juror, on account of his religious belief. Provided, He believes in the existence of God, and that, under His dispensation, such person will be held morally accountable for his acts, and be rewarded or punished therefor, either in this world or the world to come. That no religious test ought ever to be required as a qualification for any office of profit or trust in this State other than a declaration of belief in the existence of God; nor shall the legislature prescribe any other oath of office than the oath prescribed by this constitution.' Or like that in Articles 2 and 3, of Part 1st, of the Constitution of Massachusets, 1780: `It is the right as well as the duty of all men in society publicly and at stated seasons, to worship the Supreme Being, the great Creator and Preserver of the universe. * * * As the happiness of a people and the good order and preservation of civil government essentially depend upon piety, religion and morality, and as these cannot be generally diffused through a community but by the institution of the public worship of God and of public instructions in piety, religion and morality: Therefore, to promote their happiness and to secure the good order and preservation of their government, the people of this commonwealth have a right to invest their legislature with power to authorize and require, and the legislature shall, from time to time, authorize and require, the several towns, parishes, precincts and other bodies-politic or religious societies to make suitable provision, at their own expense, for the institution of the public worship of God and for the support and maintenance of public Protestant teachers of piety, religion and morality in all cases where such provision shall not be made voluntarily.' Or as in sections 5 and 14 of Article 7 of the constitution of Mississippi, 1832: `No person who denies the being of a God, or a future state of rewards and punishments, shall hold any office in the civil department of this State. * * * Religion, morality and knowledge being necessary to good government, the preservation of liberty, and the happiness of mankind, schools and the means of education, shall forever be encouraged in this State.' Or by Article 22 of the constitution of Delaware, 1776, which required all officers, besides an oath of allegiance, to make and subscribe the following declaration: `I, A.B., do profess faith in God the Father, and in Jesus Christ, His only Son, *449 and in the Holy Ghost, one God, blessed for evermore; and I do acknowledge the Holy Scriptures of the Old and New Testament to be given by divine inspiration.'
"Even the Constitution of the United States, which is supposed to have little touch upon the private life of the individual, contains in the First Amendment a declaration common to the constitutions of all the States, as follows: `Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof,' etc. And also provides in Article 1, section 7 (a provision common to many constitutions,) that the Executive shall have ten days (Sundays excepted) within which to determine whether he will approve or veto a bill.
"There is no dissonance in these declarations. There is a universal language pervading them all, having one meaning; they affirm and reaffirm that this is a religious nation. These are not individual sayings, declarations of private persons; they are organic utterances; they speak the voice of the entire people. While because of a general recognition of this truth the question has seldom been presented to the courts, yet we find that in Updegraph v. The Commonwealth, 11 S. & R. 394, 400, it was decided that, `Christianity, general Christianity, is, and always has been, a part of the common law of Pennsylvania; * * * not Christianity with an established church, and tithes, and spiritual courts; but Christianity with liberty of conscience to all men.' And in The People v. Ruggles, 8 Johns. 290, 294, 295, Chancellor Kent, the great commentator on American law, speaking as Chief Justice of the Supreme Court of New York, said: `The people of this State, in common with the people of this country, profess the general doctrines of Christianity, as the rule of their faith and practice; and to scandalize the author of these doctrines is not only, in a religious point of view, extremely impious, but, even in respect to the obligations due to society, is a gross violation of decency and good order. * * * The free, equal and undisturbed enjoyment of religious opinion, whatever it may be, and free and decent discussions on any religious subject, is granted and secured; but to revile, with malicious and blasphemous contempt, the religion professed by almost the whole community, is an abuse of that right. Nor are we bound, by any expressions in the Constitution as some have strangely supposed, either not to punish at all, or to punish indiscriminately, the like attacks upon the religion of Mahomet or of the Grand Lama; and for this plain reason, that the case assumes that we are a Christian people, and the morality of the country is deeply ingrafted upon Christianity, and not upon the doctrines or worship of those impostors.' And in the famous case of Vidal v. Girard's Executors, 2 How. 127, 198, this court, while sustaining the will of Mr. Girard, with its provision for the creation of a college into which no minister should be permitted to enter, observed: `It is also said, and truly, that the Christian religion is a part of the common law of Pennsylvania.'
"If we pass beyond these matters to a view of American life as expressed by its laws, its business, its customs and its society, we *450 find everywhere a clear recognition of the same truth. Among other matters note the following: The form of oath universally prevailing, concluding with an appeal to the Almighty; the custom of opening sessions of all deliberative bodies and most conventions with prayer; the prefatory words of all wills, `In the name of God, amen;' the laws respecting the observance of the Sabbath, with the general cessation of all secular business, and the closing of the courts, legislatures, and other similar public assemblies on that day; the churches and church organizations which abound in every city, town and hamlet; the multitude of charitable organizations existing everywhere under Christian auspices; the gigantic missionary associations, with general support, and aiming to establish Christian missions in every quarter of the globe. These, and many other matters which might be noticed, add a volume of unofficial declarations to the mass of organic utterances that this is a Christian nation."
This review of the background and environment of the period in which the constitutional language was fashioned and adopted is necessary if we are to determine the spirit and intention of the Congress which submitted the constitutional amendments to the people, and the intention of the people themselves in adopting them. Clearly, there was never any intention to prohibit non-sectarian recognition of God by the State in public transactions and exercises, and New Jersey has recently reaffirmed that intention, for the Preamble to the State Constitution of 1947 was carried over verbatim from the Constitution of 1844 and reads as follows:
"We, the people of the State of New Jersey, grateful to Almighty God for the civil and religious liberty which He hath so long permitted us to enjoy, and looking to Him for a blessing upon our endeavors to secure and transmit the same unimpaired to succeeding generations, do ordain and establish this Constitution."
Mr. Justice Black, speaking for the Court in Everson v. Board of Education (1947), 330 U.S. 1, 168 A.L.R. 1392, 91 L.Ed. 711, 67 S.Ct. 504, held that:
"The `establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. *451 No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa. In the words of Jefferson, the clause against establishment of religion by law was intended to erect `a wall of separation between Church and State.' Reynolds v. United States, supra (98 U.S., at 164, 25 L.Ed. 249)."
The First Amendment was intended to prohibit legislation for support of any religious tenets or the modes of worship of any sect, Davis v. Beason (1890), 133 U.S. 333, 342, 39 L.Ed. 637, 639, 10 S.Ct. 239, and as Justice Black himself, in the Everson case, supra, said:
"New Jersey cannot consistently with the `establishment of religion' clause of the First Amendment contribute tax-raised funds to the support of an institution which teaches the tenets and faith of any church,"
he doubtless construed "religion" as "sectarianism" or "religious tenets."
Evidence of this construction is further demonstrated by the fact that the states aid all religions by exempting church property from taxation and at the same time furnish state-paid police and fire protection and all usual governmental services, while the national government has a chaplain for each house of the Congress who daily invokes divine blessing and guidance, and the armed forces have commissioned chaplains from early days. This, too, finds support in the Everson case, supra, for it holds that the purpose of the First Amendment "requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions than it is to favor them."
In Lewis v. Board of Education of the City of New York (1935), 285 N.Y.S. 164, the Court said that:
"Undisguised, the plaintiff's attack is on a belief and trust in God and in any system or policy or teaching which enhances or fosters *452 or countenances or even recognizes that belief and trust. Such belief and trust, however, regardless of one's own belief, has received recognition in state and judicial documents from the earliest days of our Republic * * * liberty for non-believers in God, but denial to believers in a Deity, would be a mock liberty."
As there is no issue of prohibition upon the free exercise of religion, the crux of the sole question presented is whether the directed daily reading, without comment, in public school classrooms of five verses of the Old Testament of the Holy Bible, and the permissive repeating of the Lord's Prayer, in accordance with the New Jersey statutes, constitutes an "establishment of religion" as enjoined by the First Amendment. In other words, does it constitute denominational or sectarian instruction and thus support any religious tenets, or the mode of worship of any sect?
The great weight of authority in the state courts holds that the Bible itself is not a sectarian book and can be read in the schools to inculcate fundamental morality. Vidal v. Girard's Exrs. (1844), 2 How. 127, 11 L.Ed. 205; Evans v. Selma Union High School District of Fresno County, 193 Cal. 54, 222 P. 801, 802, 31 A.L.R. 1121; Vollmar v. Stanley (1927), 81 Colo. 276, 255 P. 610; Freeman v. Scheve, 59 L.R.A. 927, 932 (Neb. 1902); Moore v. Monroe, 52 Am. Rep. 444 (Iowa 1884); Nessle v. Hum, 2 Ohio Dec. 60; Billard v. Bd. of Education of the City of Topeka, 2 Ann. Cases 521 (Kan. Sup. Ct. 1904); Pfeiffer v. Bd. of Education of Detroit, 49 L.R.A. 536 (Mich. 1898); Hackett v. Brooksville Graded School District, 87 S.W. 792, 794, 120 Ky. 608, 69 L.R.A. 592, 117 Am. St. Rep. 599, 9 Ann. Cases 36; Church v. Bullock, 104 Tex. 1, 109 S.W. 115, 16 L.R.A. (N.S.) 860.
Mr. Justice Jackson, concurring in McCollum v. Board of Education (Ill. 1948), 333 U.S. 203-256, said:
"Authorities list 256 separate and substantial religious bodies to exist in the continental United States. Each of them, through the suit of some discontented but unpenalized and untaxed representative, has as good a right as this plaintiff to demand that the courts compel the schools to sift out of their teaching everything inconsistent with its doctrines. If we are to eliminate everything that is objectionable *453 to any of these warring sects or inconsistent with any of their doctrines, we will leave public education in shreds. Nothing but educational confusion and a discrediting of the public school system can result from subjecting it to constant law suits.
"While we may and should end such formal and explicit instruction as the Champaign plan and can at all times prohibit teaching of creed and catechism and ceremonial and can forbid forthright proselyting in the schools, I think it remains to be demonstrated whether it is possible, even if desirable, to comply with such demands as plaintiff's completely to isolate and cast out of secular education all that some people may reasonably regard as religious instruction. Perhaps subjects such as mathematics, physics or chemistry are, or can be, completely secularized. But it would not seem practical to teach either practice or appreciation of the arts if we are to forbid exposure of youth to any religious influences. Music without sacred music, architecture minus the cathedral, or painting without the scriptural themes would be eccentric and incomplete, even from a secular point of view. Yet the inspirational appeal of religion in these guises is often stronger than in forthright sermon. Even such a `science' as biology raises the issue between evolution and creation as an explanation of our presence on this planet. Certainly a course in English literature that omitted the Bible and other powerful uses of our mother tongue for religious ends would be pretty barren. And I should suppose it is a proper, if not an indispensable, part of preparation for a worldly life to know the roles that religion and religions have played in the tragic story of mankind. The fact is that, for good or for ill, nearly everything in our culture worth transmitting, everything which gives meaning to life, is saturated with religious influences, derived from paganism, Judaism, Christianity  both Catholic and Protestant  and other faiths accepted by a large part of the world's peoples. One can hardly respect a system of education that would leave the student wholly ignorant of the currents of religious thought that move the world society for a part in which he is being prepared.
"But how one can teach, with satisfaction or even with justice to all faiths, such subjects as the story of the Reformation, the Inquisition, or even the New England effort to found `a Church without a Bishop and a State Without a King,' is more than I know."
That the Bible, or any particular edition, has been adopted by one or more denominations as authentic, or by them asserted to be inspired, cannot make it a "sectarian book." The book itself, to be sectarian, must show that it teaches the peculiar dogmas of a sect as such, and not alone that it is so comprehensive as to include them by the partial interpretation of its adherents. Nor is a book sectarian merely because it was edited or compiled by those of a particular *454 sect. It is not the authorship nor mechanical composition of the book, nor the use of it, but its contents, that give it its character. The question is not whether the version used is canonical or apocryphal. The King James translation of the Bible, or any edition of the Bible, is not a sectarian book and the reading thereof without comment in the public schools does not constitute sectarian instruction. Hackett v. Brooksville Graded School District, supra.
If the Bible, particularly the Old Testament, is not a sectarian book, it necessarily follows that a mere reading therefrom, without comment, cannot be called sectarian instruction, and as such, is not in violation of the First or Fourteenth Amendments, even to those persons known as atheists.
Nor is the reading of the Lord's Prayer in the opening exercises of public schools sectarian instruction. Moore v. Monroe, supra; Billard v. Board of Education, supra; Church v. Bullock, supra; Hackett v. Brooksville Graded School District, supra.
In construing a New Jersey statute in the Everson case, supra, the Court held that "We must consider the New Jersey statute in accordance with the foregoing limitations imposed by the First Amendment. But we must not strike that state statute down if it is within the state's constitutional power, even though it approaches the verge of that power."
My conclusion is that a repetition of the Lord's Prayer as a morning exercise, without comment or remark, for the purpose of quieting pupils and preparing them for their daily studies, and a reading from the Old Testament of the Holy Bible, without comment, as the book best adapted from which to teach children and youth the principles of piety, justice, and a sacred regard for truth, love for their country, humanity and a universal benevolence, are certainly not designed to inculcate any particular dogma, creed, belief or mode of worship, and accordingly, the provisions of the New Jersey statutes under review do not contravene the First and Fourteenth Amendments of the United States Constitution.
Defendants' motion for summary judgment will be granted and plaintiffs' motion necessarily denied.