ABRAHAM RESNICK, PLAINTIFF-RESPONDENT, v. EAST BRUNSWICK TOWNSHIP BOARD OF EDUCATION, DEFENDANT-APPELLANT, AND REFORM TEMPLE OF EAST BRUNSWICK, EAST BRUNSWICK BAPTIST CHURCH, NATIVITY EVANGELICAL LUTHERAN CHURCH OF EAST BRUNSWICK, DEFENDANTS, AND NEW JERSEY COUNCIL OF CHURCHES, INTERVENORS.

ABRAHAM RESNICK, PLAINTIFF-RESPONDENT, v. REFORM TEMPLE OF EAST BRUNSWICK, DEFENDANT-APPELLANT, AND EAST BRUNSWICK TOWNSHIP BOARD OF EDUCATION, EAST BRUNSWICK BAPTIST CHURCH, NATIVITY EVANGELICAL LUTHERAN CHURCH OF EAST BRUNSWICK, DEFENDANTS, AND NEW JERSEY COUNCIL OF CHURCHES, INTERVENORS.

Argued January 23, 1978—Decided July 11, 1978.

*Mr. David B. Rubin* argued the cause for appellant East Brunswick Township Board of Education (*Messrs. Rubin* and *Lerner,* attorneys; *Mr. Frank J. Rubin* on the brief).

*Mr. Samuel H. Davis* argued the cause for appellant Reform Temple of East Brunswick *(Messrs. Dubowsky* and *Davis,* attorneys).

*Mr. William J. Brennan, III,* argued the cause for intervenor-appellant *(Messrs. Smith, Stratton, Wise* and *Heher,*

attorneys; *Mr. Brennan* and *Ms. Ann Reicheldfer,* on the brief).

*Mr. Sanford Rader* argued the cause for respondent (*Messrs. Kovacs, Anderson, Horowitz* and *Rader,* attorneys).

The opinion of the court was delivered by

PASHMAN, J. The relationship of church and state has become one of the most sensitive areas in the law. Permitting religious observances to take place on public school property raises important and vexing constitutional issues. To some persons, use of school premises by any group necessarily carries with it the appearance of government approval of that body and its activities. Thus, whenever an issue involving the use of school property for religious purposes arises, our inquiry must be particularly searching. The specific controversy in this appeal concerns the extent to which public school facilities may be used for religious instruction and services when they are not being used for regular educational purposes.

Since 1962 defendant East Brunswick Township School Board has allowed a number of local groups to use its school facilities during non-school hours. The lessees of school premises have included various religious groups as well as other nonprofit social, civic, recreational and charitable groups. The diversity and plenitude of the organizations using the school are reflective of Board policy, related in its "Rules and Regulations Governing Use of East Brunswick School Facilities."

I. *Statement of Philosophy*

It is the feeling of this Board of Education that each of the East Brunswick Public Schools, build [*sic*] and maintained through the expenditure of public funds, should be utilized to the fullest extent possible by East Brunswick community groups and agencies. Provisions for the control and protection of these facilities as hereafter established emanate from the Board's position as the responsible body for the upkeep and maintenance of such facilities.

A rental is assessed which approximates the cost of janitorial services.[1] Where a group is using the facilities for fund raising purposes or if admission is charged, a substantially higher rental is assessed in accordance with a published rental schedule.[2] The Board's policy provides that applications for use of the school premises be made to the principal of the school involved. Groups such as religious organizations which use the facilities on a steady basis for an indeterminate period make annual reapplications. This was done by all of the religions organizations discussed herein.

Starting in 1969 the East Brunswick Baptist Church had rented an all-purpose room in an elementary school for religious services and ten classrooms for religious instruction on Sundays. The all-purpose room was also rented for Wednesday evening prayer meetings. Bibles, hymnals and a wooden pulpit with a cross were stored in a closet off the all-purpose room, along with school recreational equipment. The Church owned a five-acre building site in the township and as of the trial date had retained an architect, an engineer and had applied for site plan approval to the township planning board. At the time of oral argument before this Court, the East Brunswick Baptist Church no longer used the school.[3]

Nativity Evangelical Lutheran Church began renting facilities in an elementary school in September 1968. It

---

[1]The regulations of the Board set $4.50 as the hourly rate for extra janitorial services required in conjunction with the use of school premises by a community group. The actual out of pocket cost to the Board for those services is approximately $6.75 per hour.

[2]Apparently fund raising does not include collections taken during religious services, as the higher rental for such activity was not charged the religious organizations.

[3]At oral argument we were informed that the small congregation of the Baptist Church was unable to afford construction of a building on the five-acre plot. Instead, it has purchased a smaller facility in the community.

used the school for religious instruction on Sundays, occupying the all-purpose room and some ten classrooms. Sunday school literature and materials were locked in a cabinet. The Church has a separate building for worship. At the time of the trial the Church had employed an architect to plan an addition to its building for purposes of having classrooms for religious education. At present, the Lutheran Church is not making use of school facilities.

Since March 1973 the Reform Temple of East Brunswick has rented most of an elementary school building for services and instruction for five hours on Sundays. It also rents the gymnasium for religious services and social gatherings on Friday evenings and five classrooms for Hebrew language instruction for children on Tuesday and Thursday evenings. A few religious artifacts were stored in the schools. The Reform Temple had an option to purchase a building site at the time of the trial and had also retained an architect. However, the building has not been completed, and use of the school continued as of the date of oral argument.[4]

---

[4]At oral argument counsel for defendant Jewish Reform Temple informed the Court that pursuant to an extension granted by the trial judge, the group would use the school until June 1978. Construction of the Temple is nearly completed and it is expected to be occupied by September 1978.

As of the date of this opinion, the Jewish Reform Temple is no longer using school premises. However, three other religious groups in East Brunswick are using public school facilities. Despite the fact that none of the original defendants is using the schools at the present time, we do not deem this case to be moot. We have determined that this is a question of public importance and thus will address the merits. See Sente v. Mayor and Mun. Coun. Clifton, 66 N. J. 204, 209–211 (1975) (Pashman, J., dissenting) ; Dunellen Bd. of Ed. v. Dunellen Ed. Ass'n, 64 N. J. 17, 21 (1972) ; Busik v. Levine, 63 N. J. 351, 364 (1973), appeal dismissed 414 U. S. 1106, 94 S. Ct. 831, 38 L. Ed. 2d 733 (1973) ; John F. Kennedy Memorial Hospital v. Heston, 58 N. J. 576, 578 (1971) ; Bd. of Ed. E. Brunswick Tp. v. Coun., E. Brunswick, 48 N. J. 94, 109 (1966) ; State v. Perricone, 37 N. J. 463, 469 (1962), cert. den. 371 U. S. 890, 83 S. Ct. 189, 9 L. Ed. 2d 124 (1962) ; Annotation, "Public interest as a ground for

Upon learning of the use of East Brunswick schools for religious purposes, plaintiff Abraham Resnick complained to the Board of Education. When the Board did not take any action to prevent the religious groups from using the schools, Resnick filed a complaint in the Chancery Division in October 1974. He alleged that use of the schools by religious groups violated *N. J. S. A.* 18A:20–34, the statute governing the operation of public school facilities, and the federal and state constitutions. All three religious groups intervened as third party defendants.

The trial judge, in an opinion reported at 135 *N. J. Super.* 257 (Ch. Div. 1975), held that *N. J. S. A.* 18A:20–34 neither contemplated nor permitted the use of public schools by religious groups for worship services but that Sunday School and Hebrew instruction were within the purview of the statute's permitted uses. However, the judge went on to hold that even a use limited to education involved some small outlay of taxpayer funds for utilities and thus violated the prohibition against public expenditures in support of religion found in *N. J. Const.* (1947), Art. I, par. 3. Nevertheless, he indicated that a rent schedule based on actual costs of utilities, administrative and janitorial services would cure that state constitutional difficulty.

---

refusal to dismiss an appeal, where question has become moot, or dismissal is sought by one or both parties," 132 *A. L. R.* 1185 (1941). As we have recently observed:

* * * [T]here is no constitutional mandate that a court may not go beyond what is necessary to decide a case at hand. Whether an issue will be dealt with narrowly or expansively calls for a judge's evaluation of many things, including the need for guidance for the bar or agencies of government or the general public. * * *
So a court may decide an issue even though the litigation has become moot, again in the public interest * * *.

[*Busik v. Levine*, supra, 63 *N. J.* at 363–364; citations omitted]

Moreover, the Court is not faced with the perils of deciding an abstract question or couching its opinion in terms of an unrealistic or artificial factual situation. The record displays a real set of facts, one which sharply focuses the constitutional arguments the parties have made.

The judge also held that the use of schools for religious worship and instruction violated the First and Fourteenth Amendments of the United States Constitution. He alluded to the significant financial benefit provided to the religious groups which used schools indefinitely and which were thus enabled to avoid making expenditures for other facilities at commercial rental rates or for constructing their own buildings. The judge also found administrative entanglement in record keeping and scheduling by employees of the Board, and political entanglement in subjecting defendant Board's members to pressures by those in favor of and those opposed to religious use of public school facilities. The court also found excessive entanglement in the storage of religious artifacts and books in school buildings where they were accessible to children during school hours.

The court limited its decision by indicating that its ruling did not deal with the rental of public school facilities to religious groups at rental rates approximating that which would be charged on the open market for comparable private facilities. Nor did it cover temporary use of public school facilities during emergencies such as after a fire or flood. The Board was given 45 days in which to submit a proposal for continued use of the facilities for a fixed time in order to allow the defendant religious organizations to secure other accommodations. The Board's proposal as slightly modified was included in the court's Final Judgment and Order of December 1, 1975. In essence, the religious groups[5] were permitted to continue using public school facilities for a period of one year at a rate approximating the cost paid by

---

[5] A fourth religious organization, Young Israel of East Brunswick, petitioned to intervene as a defendant in late November 1975. That group had started using public school facilities on June 14, 1975, but had been paying a rental as well as fees for custodial services. It sought to be included in the plan for continued temporary use. No mention of this petition or Young Israel is made in the Final Order and that group took no further part in the case.

the Board for the rental of classroom space in a local church building which was used to handle pupil overflow. No religious artifacts were to be stored in the schools.

Both the Reform Temple and the Board appealed. Upon consolidating these appeals the Appellate Division heard arguments and affirmed "substantially for the same reasons" expressed by the trial court. 144 *N. J. Super.* 474 (App. Div. 1976). The Board and Reform Temple appealed as of right pursuant to *R.* 2:2–1. Plaintiff cross-appeals. Of the original defendants, only the Board and Reform Temple appeared before this Court. We granted the New Jersey Council of Churches' petition to intervene as a party defendant on appeal.

## I

### *Nonconstitutional Grounds*

Pursuant to *N. J. S. A.* 18A:20–34, boards of education are permitted to adopt rules by which school properties may be used when not in use for school purposes. That statute provides in pertinent part:

The board of education of any district may, pursuant to rules adopted by it, permit the use of any schoolhouse and rooms therein, and the grounds and other property of the district, when not in use for school purposes, for any of the following purposes:

a. The assembly of persons for the purpose of giving and receiving instruction in any branch of education, learning, or the arts, including the science of agriculture, horticulture, and floriculture;

* * * * * * * *

c. The holding of such social, civic, and recreational meetings and entertainments and such other purposes as may be approved by the board; * * *.

We fully concur in the view of the courts below that *N. J. S. A.* 18A:20–34(a) contemplates religious educational programs as well as secular ones. *See Lewis v. New York City Bd. of Ed.*, 157 *Misc.* 520, 285 *N. Y. S.* 164, 169–170 (Sup. Ct. 1935). However, we disagree with the

trial judge's conclusion that *N. J. S. A.* 18A:20–34 does not contemplate, among a myriad of possible uses of school property, the holding of religious services during non-school hours. The reasons given for this conclusion are unpersuasive. The maxim *expressio unius est exclusio alterius* is invoked for the proposition that since religious purposes are not listed in *N. J. S. A.* 18A:20–34(c), the only section which arguably authorizes school use for religious services, such use is impliedly excluded. However, this maxim is merely an aid in construction. *Reilly v. Ozzard,* 33 *N. J.* 529, 539 (1960). "The final question is whether in a given context an express provision with respect to a portion of an area reveals by implication a decision with respect to the remainder. The issue is one of intention. The answer resides in the common sense of the situation." *Id., see* 2A Sutherland, *Statutory Construction,* § 47.24 at 127 (Sands. ed. 1973). As we held in *Gangemi v. Berry,* 25 *N. J.* 1, 11 (1957), the maxim does not carry the weight of a rule of law and is to be applied with great caution, and not arbitrarily or in a manner at variance with its true purpose.

Had *N. J. S. A.* 18A:20–34(c) merely provided for "civic, educational and recreational" use, the legislative intent might aptly be termed as limiting the use of school premises exclusively to those items listed. However, such a construction would render the following phrase, "and such other uses as may be approved by the board," meaningless. Moreover, the absence of a qualifying term such as "like," "similar" or "related," with respect to the above phrase, indicates that the legislature intended to grant wide discretion to boards of education in such matters. Thus, additional uses are not strictly limited to civic, social and recreational uses.

The trial judge also concluded that religious services could not have been contemplated under *N. J. S. A.* 18A:20–34 because of the absence of any mention of such uses therein, while religious purposes were specifically listed in other statutes. 135 *N. J. Super.* at 161. However, those

statutes considered by the trial judge which do mention religion have as their purpose the creation of specific rights for religious bodies. *See N. J. S. A.* 15:14–6 (granting religious and other charitable groups the power to own, manage and convey property); *N. J. S. A.* 45:24–7 (exemption of religious groups from licensing requirements); *N. J. S. A.* 10:1–3 and *N. J. S. A.* 18A:38–5.1 (the civil rights of religious and other groups); *N. J. Const.* (1947), Art. VIII, § 1, par. 2 (the constitutional tax exemption for religious bodies).[6] In contrast, *N. J. S. A.* 18A:20–34 was never intended as a specific grant of a right or privilege to religious groups. Rather, the object of that enactment was merely to entrust to local school boards, within certain guidelines, the determination of the uses beyond the purely educational to which school property might be devoted. Literal application of the approach utilized by the trial judge would entail prohibiting from being considered as a permissible school use any item addressed specifically in another statute and not so addressed in *N. J. S. A.* 18A:20–34. Such an interpretation would be greatly at odds with the discretion granted to boards of education by the plain wording of *N. J. S. A.* 18A:20–34.

▉▉ Plaintiff also invites us to apply the principle of *ejusdem generis,* a maxim to the effect that where general words follow specific enumeration, the general words are only applicable to the same general class of things already specifically mentioned, in construing the statute. *See* Sutherland, *supra,* § 47.17 at 103. Even assuming that this maxim is properly applicable, we do not find that it would preclude statutory authorization for religious services in the schools.

---

[6]Additionally, the mention of religion in the two other statutes cited by the trial court is merely incidental. *N. J. S. A.* 39:4–139, a traffic regulation statute, only mentions "church" as one of many public places where passenger loading is restricted. Similarly, *N. J. S. A.* 18A:72A–3, only mentions "places of worship" and "sectarian schools" in order to clarify the definition of "educational facility."

The listed activities include social, civic and recreational meetings and entertainments. Common denominators for all of these activities include group interaction, emotional release, regular participation of a portion of the community and character building. Religious services would certainly seem to include all of these beneficial characteristics. Plaintiff complains that only those sects using the schools are benefited by this policy. While these ceremonies admittedly benefit only the particular sect involved, the same observation holds true with respect to use of the gym by a basketball league or use of school premises by any other group. If every activity in a school had to be shown to benefit directly each person in the entire community, little other than education would go on in school buildings, thus defeating the basic aim of *N. J. S. A.* 18A:20–34.

More importantly, use of public schools on a temporary basis by religious groups is a long-standing tradition in New Jersey. In East Brunswick Township itself, use of public school buildings for religious services and meetings was common in the Nineteenth Century. In that period the Church of the Holy Trinity at Washington, the Washington Methodist Episcopal Church and the Simpson Methodist Church of Old Bridge all made use of schoolhouses. W. Woodford Clayton, *History of Union and Middlesex Counties,* Everts & Peck, Philadelphia, 1882, pp. 771–774. This list of users is certainly not exhaustive with respect to other towns.

Since the practice of having worship services in schoolhouses was not uncommon in the years preceding passage of *L.* 1913, *c.* 309, the forerunner of *N. J. S. A.* 18A:20–34, it may reasonably be presumed that the absence of an express declaration to the contrary is strong evidence that the Legislature did not intend to prohibit this long-standing practice. This has continued since passage of the Act. In fact, the defendant in this case lists a dozen instances within the past 25 years wherein religious groups used school premises on a temporary basis during non-school hours.

██ We conclude that there is no statutory bar to religious services or instruction being carried out in public schools during periods where those facilities are not required for regular educational activities.

## II

### State Constitutional Grounds

In order to put the remaining issues in the instant case in proper perspective, we note that the use of the schools by these religious groups was on the same terms and at the same rates as for the other non-profit groups. Nothing in the record indicates that the religious groups' use of facilities was so time consuming as to effectively prevent other groups from the use and enjoyment of the schools at non-instructional times. In fact, at oral argument counsel for the New Jersey Council of Churches indicated that had demand for school facilities by various groups outstripped their availability, an equal distribution of available time slots would have been proper. This method was deemed superior to granting churches or any other groups all the time they wanted while totally precluding the use of facilities by other organizations. Moreover, the record indicates that on occasion several of the religious groups were preempted, or denied use of the school building in question, so that school-related activities could go on. The Rabbi for the Reform Temple indicated that on more than one occasion his group was ousted on less than 24 hours' notice. No school-related activity has ever been interfered with by religious groups.

Thus, the real issue is whether the state or federal constitutions require a special treatment for religious groups, such that out of all non-profit groups only those religiously affiliated are constitutionally prohibited from the use of school premises. We start by noting that our state constitution contains a provision which, fairly read, specifically prohibits the use of tax revenues for the maintenance or support of a religious group.

No person shall be deprived of the inestimable privilege of worshiping Almighty God in a manner agreeable to the dictates of his own conscience; nor under any pretense whatever be compelled to attend any place of worship contrary to his faith and judgment; nor shall any person be obliged to pay tithes, taxes, or other rates for building or repairing any church or churches, place or places of worship, or for the maintenance of any minister or ministry, contrary to what he believes to be right or has deliberately and voluntarily engaged to perform.

[*N. J. Const.* (1947), Art. I, par. 3]

This constitutional position is not carried to an extreme. In *Clayton v. Kervick,* 56 *N. J.* 523, 529 (1970), vacated and remanded 403 *U. S.* 945, 91 *S. Ct.* 2274, 29 *L. Ed.* 2d 854 (1971), on remand 59 *N. J.* 583 (1971), Chief Justice Weintraub observed that "[n]o one suggests that the State must withhold such general services as police or fire protection, even though the property is exempted from general taxation because of its sectarian use," citing *Walz v. Tax Commission,* 397 *U. S.* 664, 90 *S. Ct.* 1409, 25 *L. Ed.* 2d 697, 703 (1970); *Bd. of Ed. of Central School District No. 1 v. Allen,* 392 *U. S.* 236, 242, 88 *S. Ct.* 1923, 20 *L. Ed.* 2d 1060, 1065 (1968). However, the public obligation of fire protection is distinguishable from a school board's permitting a religious group to rent school property during free hours.

We conclude that *N. J. Const.* (1947), Art. I, par. 3, prohibits any lease arrangement between a school board and religious groups under which the out-of-pocket expenses of the board directly attributable to the use by the religious body are not fully reimbursed. We affirm the holding below that this constitutional infirmity may be remedied by an upward adjustment of rentals to religious groups which would fully cover extra utility, heating, administrative and janitorial costs which result from the leasing by these groups.

In view of our holding that the state constitution does require that religious organizations be singled out among nonprofit groups in general as being ineligible for

certain benefits which are partly subsidized by tax-generated funds, we must go on to determine whether they are further singled out by a total prohibition on their use of school premises. The relevant constitutional provisions are the following:

*N. J. Const.* (1947), Art. I, par. 4
4. Establishment of religious sect; religious or racial test for public office.
There shall be no establishment of one religious sect in preference to another; no religious or racial test shall be required as a qualification for any office or public trust.
*U. S. Const.*, Amend. I.
Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

The East Brunswick schools were open to any religious group which wished to use them. No allegation of preference of one group over another has been made. In *Clayton v. Kervick, supra,* 56 *N. J.* at 528, Chief Justice Weintraub, in comparing these two provisions, indicated that "[o]ur State provision is less pervasive, literally, than the federal provision." He limited discussion of the constitutionality of the Educational Facilities Authority Law, *N. J. S. A.* 18A:72A–1 *et seq.* to the federal provision as interpreted by the United States Supreme Court. We adopt his conclusion, as *N. J. Const.* (1947), Art. I, par. 4, does not appear to cover the instant fact situation since no one religious sect was preferred over other sects. Thus, the remainder of our discussion is directed to the validity, under the First Amendment to the Federal Constitution, made applicable to the states by the Fourteenth Amendment, *Cantwell v. Connecticut,* 310 *U. S.* 296, 303, 60 *S. Ct.* 900, 903, 84 *L. Ed.* 1213, 1218 (1940), of religious groups using school property for religious instruction and services.

### III

*Federal Constitutional Grounds*

 The First Amendment requires strict governmental neutrality with respect to religion. Since it is applicable to the states, the broad scope of the amendment directs that government " . . . shall make no law respecting an establishment of a religion, or prohibiting the free exercise thereof." These two provisions are in tension. "Where the 'establishment clause' confronts the 'free exercise clause,' the founding fathers who drew this constitutional provision intended that the 'free exercise clause' be dominant." *Valent v. N. J. State Bd. of Ed. et. als.,* 114 *N. J. Super.* 63, 72 (Ch. Div. 1971). However, this is not a free exercise case.

> . . . [I]t is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion. The distinction between the two clauses is apparent — a violation of the Free Exercise Clause is predicated on coercion while the Establishment Clause violation need not be so attended.
>
> [*Abington School District v. Schempp,* 374 *U. S.* 203, 223, 83 *S. Ct.* 1560, 1572, 10 *L. Ed.* 2d 844, 858 (1963)]

The only issue of concern to us is whether permitting religious groups to rent public school facilities at a rate reflective of the cost incurred by the school board as a result of such use runs afoul of the "establishment clause."

> The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. . . . No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion.
>
> * * * * * * * *
>
> That Amendment requires the state to be neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary.
>
> [*Everson v. Bd. of Education,* 330 *U. S.* 1, 15–16, 18, 67 *S. Ct.* 504, 511–512, 513, 91 *L. Ed.* 711, 723, 724–5 (1947)]

While there is a split among jurisdictions as to whether it is constitutionally permissible for public school premises to be used for religious purposes, see *Anno*: "Schools — Use for Religious Purposes", 79 *A. L. R.* 2d 1148, § 4 at 1163 (1961), the only case within the last 35 years which addressed the federal constitutional issue upheld the use. In *Southside Estates Bapt. Church v. Bd. of Trustees*, 115 *So.* 2d 697 (Fla. Sup. Ct. 1959) the Supreme Court of Florida held that public schools could be used temporarily as a place of worship during non-school hours. The record did not indicate whether rent was paid by the users or expenses were incurred by the school trustees. The relevant Florida statute, *Fla. Stat. Ann.* § 235.02, permitted use of school buildings during non-school hours "for any legal assembly." The court rejected the view that the public was impermissibly subsidizing religion.

Taking note of appellant's insistence that the use of the building is something of value and that the wear and tear is an indirect contribution from the public treasury, it appears to us that we might properly apply the maxim *De minimis non curat lex*.

[115 *So.* 2d at 699]

The court also found that no impermissible preference for one sect over another existed since four or five religious groups had been accorded the same treatment. However, the court indicated that its decision might have been different had the case involved a situation where a church contemplated permanent use of school facilities.

. . . [W]e interpolate by way of dictum that it is conceivable that the power granted by this statute could be so abused that it would result in a violation of the Constitution. For example, if the use of the school buildings were permitted for prolonged periods of time, absent evidence of an immediate intent on the part of the church to construct its own building, we think it could hardly be contemplated that the public school system or its property could be employed in the

permanent promotion of any particular sect or denomination. Such, however, is not the case here.

[115 *So.* 2d at 700][7]

No outer boundary was set as to how long use of the schools could continue. Instead, local boards were given reasonable discretion as to determining the use of school buildings, ". . . subject of course, to judicial review should such discretion be abused to the point that it could be construed as a contribution of public funds to a particular religious group or as the promotion or establishment of a particular religion." *Id.*

In the absence of any subsequent developments in this area, we would stop here and reverse those parts of the judgment below which conflict with the analysis in *Southside Estates Bapt. Church v. Bd. of Trustees, supra.* However, several recent opinions by the United States Supreme Court have further refined the analysis to be applied in determining whether a given relationship between church and state is permissible

In *Abington School District v. Schempp, supra,* the Supreme Court announced the following test for measuring a

---

[7]The dissent of Justice Clifford, joined by Judge Conford, see *post* at 135, misreads *Southside Estates, supra.* That opinion did not propose that a mechanistic finding of Establishment Clause problems was required every time a church group used school facilities for a long period of time. Rather, it set out a two-part test. *Southside Estates, supra,* indicated, "by way of dictum," that use of school buildings by religious groups would run afoul of the Establishment Clause if it were both (1) prolonged and (2) with no "immediate intent on the part of the church to construct its own building." Here every single religious group using East Brunswick schools has actively pursued plans to build its own house of worship. The whole point of *Southside Estates* was to require a sensitive weighing of the facts in each case. This approach is surely preferable to one which would automatically deem every use over a considerable period of time to be "permanent promotion" of a sect by the State. "The problem, like many problems in constitutional law, is one of degree." *Zorach v. Clauson,* 343 *U. S.* 306, 314, 72 *S. Ct.* 679, 684, 96 *L. Ed.* 954, 962 (1951).

governmental enactment against "establishment clause" prohibitions.

> The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion.
>
> [374 *U. S.* at 222, 83 *S. Ct.* at 1571, 10 *L. Ed.* 2d at 858]

In *Walz v. Tax Commission, supra,* 397 *U. S.* at 674, 90 *S. Ct.* at 1414, 25 *L. Ed.* 2d at 704, the Supreme Court added a third test; the statute must not foster "an excessive entanglement with religion." The objective of these tests has been well summarized as protection against "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz v. Tax Commission, supra,* 377 *U. S.* at 668, 90 *S. Ct.* at 1411, 25 *L. Ed.* 2d at 701. To uphold the use of school premises by religious groups for instruction and worship, this Court must assure itself that all of these tests are met.

For an enactment to pass the test of having a secular purpose, little more is required than a reasonable legislative statement announcing a colorable secular design. Thus, in *Lemon v. Kurtzman,* 403 *U. S.* 602, 609, 91 *S. Ct.* 2105, 2109, 29 *L. Ed.* 2d 745, 756 (1971), the Supreme Court found a valid secular purpose in state statutes providing aid to church-related elementary and secondary schools and to teachers therein, with regard to instruction in secular matters.

> . . . the statutes themselves clearly state that they are intended to enhance the quality of the secular education in all schools covered by the compulsory attendance laws. There is no reason to believe the legislatures meant anything else. A State always has a legitimate concern for maintaining minimum standards in all schools it allows to operate.
>
> [*Id.*]

Likewise in *Sloan v. Lemon,* 413 *U. S.* 825, 899–30, 93 *S. Ct.* 2982, 2985, 37 *L. Ed.* 2d 939, 943–44 (1973), the Court found a secular purpose behind Pennsylvania's Parent Reimbursement Act for Non-Public Education, which permitted reimbursement of $75 and $150 to parents who pay tuition for their children to attend nonpublic elementary and secondary schools. The Legislature had specifically found that "parents who maintain students in nonpublic schools provide a vital service" and were deserving of at least partial reimbursement for alleviating an otherwise "intolerable public burden." *Id.* The Court deferred to this finding. In *Meek v. Pittinger,* 421 *U. S.* 349, 363, 95 *S. Ct.* 1753, 1762, 44 *L. Ed.* 2d 217, 230, reh. den. 422 *U. S.* 1049, 95 *S. Ct.* 2668, 45 *L. Ed.* 2d 702 (1975), a statute providing for the loaning of textbooks, instructional materials and professional staff to nonpublic schools was found to have a secular purpose.

Moreover, as Justice Brennan's concurring opinion in *Walz v. Tax Commission, supra,* points out, there is a valid secular purpose to tax exemptions for nonprofit organizations — including religious ones.

\* \* \* [G]overnment grants exemptions to religious organizations because they uniquely contribute to the pluralism of American society by their religious activities.

\* \* \* \* \* \* \* \*

They [the exemptions] merely facilitate the existence of a broad range of private, nonprofit organizations, among them religious groups, by leaving each free to come into existence, then to flourish or wither, without being burdened by real property taxes.

[397 *U. S.* at 689, 90 *S. Ct.* at 1422, 25 *L. Ed.* 2d at 712]

Considering these precedents, we unequivocally find that pursuant to *N. J. S. A.* 18A:20–34(a) and (c) and under the Board's "Statement of Philosophy," *ante* at 93, there was a secular purpose in leasing the school facilities. That purpose was to enhance public use of these properties for the common benefit of the residents of East Brunswick. There was no allegation of a lack of good faith on the part of

the School Board in adopting the regulations. Thus, we have no reason to doubt its stated purposes.

Many statutory schemes found to be permissible under a secular purpose test have nevertheless foundered when the Supreme Court determined that their primary effect was to advance religion. *See Wolman v. Walter,* 433 *U. S.* 229, 97 *S. Ct.* 2593, 53 *L. Ed.* 2d 714 (1977); *Meek v. Pittinger, supra; Sloan v. Lemon, supra; Committee for Public Ed. & Religious Liberty v. Nyquist,* 413 *U. S.* 756, 93 *S. Ct.* 2955, 37 *L. Ed.* 2d 948 (1973); *Tilton v. Richardson,* 403 *U. S.* 672, 91 *S. Ct.* 2091, 29 *L. Ed.* 2d 790 (1971).

> The crucial question is not whether some benefit accrues to a religious institution as a consequence of the legislative program, but whether its principal or primary effect advances religion.
>
> > [*Tilton v. Richardson, supra,* 403 *U. S.* at 679,
> > 91 *S. Ct.* at 2096, 29 *L. Ed.* 2d at 799]
>
> [I]t is clear that not all legislative programs that provide indirect or incidental benefit to a religious institution are prohibited by the Constitution. See *Zorach v. Clauson,* 343 *U. S.* 306, 312, 72 *S. Ct.* 679, 96 *L. Ed.* 954; *Lemon v. Kurtzman, supra,* 403 *U. S.* at 614, 91 *S. Ct.* 2105, 29 *L. Ed.* 2d 745. "The problem, like many problems in constitutional law, is one of degree." *Zorach v. Clauson, supra,* 343 *U. S.* at 314, 72 *S. Ct.* 679, 96 *L. Ed.* 954.
>
> > [*Meek v. Pittinger, supra,* 421 *U. S.* at 359, 95
> > *S. Ct.* at 1760, 44 *L. Ed.* 2d at 228]

For example, in *Tilton* the Court upheld the Higher Education Facilities Act of 1963 insofar as it granted funds to church-related colleges and universities for construction of buildings and facilities for exclusively secular educational purposes. However, provisions of the Act limiting the government's interest in these buildings to 20 years which had the effect of allowing their use for sectarian purposes thereafter were found to be violative of the First Amendment. The plurality opinion indicated that "unrestricted use of a valuable property is in effect a contribution of some value to a religious body." 403 *U. S.* at 683, 91 *S. Ct.* 2098, 29 *L. Ed.* 2d at 802.

The primary intent of *N. J. S. A.* 18A:20–34 is to grant school boards wide discretion in permitting use of school property when schools are not in session. The primary effect of the "Rules and Regulations Governing Use of East Brunswick School Facilities" is to benefit nonprofit community groups. While we would be naive in refusing to note the obvious advantages to young congregations in the temporary use of school premises, to hold that this scheme primarily benefits religion would be absurd. The community as a whole is benefitted when nonprofit organizations of interest to its members prosper.

Moreover, the religious groups do not have unrestrained use of valuable property, as was the case in *Tilton*. They may ony use the facilities when school related activities are not scheduled, and where another organization has not already claimed a given time slot. Religious groups have heretofore received evenhanded treatment in requesting facilities and we trust that this practice will continue in the future.

The regulations promulgated by the East Brunswick Board pursuant to *N. J. S. A.* 18A:20–34 (a) and (c) aid nonprofit organizations in general and religious groups only incidently. The record shows that such groups as the Parent-Teacher Association, drama clubs, Girl Scouts, Boy Scouts, Cub Scouts, Brownies, square dancing, garden clubs, a drum and bugle corps, St. Bartholomews' basketball team, civic associations, and Township recreation groups have used the schools. They are also used for election purposes and for Township health testing. A Chinese language school uses the facilities, too. Thus, the fact that school facilities are also used by religious groups does not render the regulations invalid as primarily advancing religion.

We also note that in *Everson v. Bd. of Education,* 330 *U. S.* 1, 67 *S. Ct.* 504, 91 *L. Ed.* 711 (1946), the Supreme Court upheld a New Jersey statute which provided funds for busing students to schools — including parochial schools.

Comparing the "free exercise" and "establishment clauses," the Court concluded that

> Measured by these standards, we cannot say that the First Amendment prohibits New Jersey from spending tax-raised funds to pay the bus fares of parochial school pupils as a part of a general program under which it pays the fares of pupils attending public and other schools. It is undoubtedly true that children are helped to get to church schools. There is even a possibility that some of the children might not be sent to the church schools if the parents were compelled to pay their children's bus fares out of their own pockets when transportation to a public school would have been paid for by the State.
>
> [*Everson v. Bd. of Education, supra*, 330 *U. S.* at 17, 67 *S. Ct.* at 512, 91 *L. Ed.* at 725]

After a short discussion noting how sectarian schools receive fire protection and other incidental public services, the Court made the following comment:

> Of course, cutting off church schools from these services, so separate and so indisputably marked off from the religious function, would make it far more difficult for the schools to operate. But such is obviously not the purpose of the First Amendment.
>
> [330 *U. S.* at 18, 67 *S. Ct.* at 512, 91 *L. Ed.* at 725]

Although *Everson* preceded the newer cases with their three-part tests, the practice of busing nonpublic school children at taxpayer expense continues. Thus, *Everson's* result is still valid. We conclude that if actual taxpayer outlays to bus children to denominational schools are permissible, there is no question that incidental expenses of wear and tear on school property when used during noninstructional hours for religious worship and teaching as well as a myriad of other activities are not a public expense primarily for the benefit of religion.

Of further significance is *Bd. of Ed. of Central School District No. 1 v. Allen, supra,* where the Court upheld a New York law authorizing the provision of secular textbooks for all children in grades 7 through 12 attending public

and nonpublic schools. This, too, strikes us as being a scheme more fraught with the danger of being primarily beneficial to religion than is that at bar.

In *Committee for Public Education v. Nyquist, supra,* the Supreme Court invalidated a New York statute insofar as it provided for direct money grants from the state to qualifying nonpublic schools and purported to grant tuition reimbursement to parents of children attending nonpublic schools. Also enjoined were tax relief provisions for parents of nonpublic school children. However, in *Nyquist,* the Court indicated that *Allen, Everson, Tilton* and *Walz* were distinguishable since they did not differentiate sectarian schools as the sole beneficiaries of aid.

Allen and Everson differ from the present litigation in a second important respect. In both cases the class of beneficiaries included *all* school children, those in public as well as those in private schools. See also Tilton v. Richardson, supra, in which federal aid was made available to *all* institutions of higher learning, and Walz v. Tax Comm'n, supra, in which tax exemptions were accorded to *all* educational and charitable nonprofit institutions. We do not agree with the suggestion in the dissent of The Chief Justice that tuition grants are an analogous endeavor to provide comparable benefits to all parents of school children whether enrolled in public or nonpublic schools. *Post,* at 801–803, 93 *S. Ct.* 2955, 37 *L. Ed.* 2d at 979, 980. The grants to parents of private school children are given in addition to the right that they have to send their children to public schools "totally at state expense." And in any event, the argument proves too much, for it would also provide a basis for approving through tuition grants the *complete subsidization* of all religious schools on the ground that such action is necessary if the State is fully to equalize the position of parents who elect such schools — a result wholly at variance with the Establishment Clause.

Because of the manner in which we have resolved the tuition grant issue, we need not decide whether the significantly religious character of the statute's beneficiaries might differentiate the present cases from a case involving some form of public assistance (e. g., scholarships) made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefitted.

[413 *U. S.* at 782 n. 38, 93 *S. Ct.* at 2970, 37 *L. Ed.* 2d at 968 n. 38]

We conclude that this case is more analogous to *Allen, Everson, Tilton* and *Walz* than it is to *Nyquist* and that the temporary use of public school facilities by religious groups does not run afoul of the prohibition against legislation primarily benefitting religion. Where essentially no public expense is incurred as a result of a benefit received by religious groups, we do not believe that the "significantly religious" character of those groups should preclude their receipt of such a benefit on the same terms as do other groups of the same class, *i. e.,* nonprofit organizations.

The basis of the trial judge's primary objection to school use by religious groups concerned the excessive entanglement between government and religion caused by the East Brunswick scheme. He found a proscribed degree of administrative and political entanglement. The former involved record keeping and scheduling by employees of the Board pursuant to regulating the use of school premises. The judge also concluded that storage of religious artifacts and books in closets which were also used to house school materials constituted entanglement. Finally, he concluded that political entanglement was possible in that pressures would be exerted on Board members by groups in favor of and opposed to this use of public school facilities by religious groups.

The excessive entanglement test was first announced in *Walz v. Tax Commission, supra,* where Chief Justice Burger framed it as follows:

Whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement.
[397 *U. S.* at 675, 90 *S. Ct.* at 1414, 25 *L. Ed.* 2d at 705]

In *Walz,* the Supreme Court upheld a state tax exemption for religious groups even though it afforded them an indirect economic benefit and occasioned some degree of state involvement. The Court reasoned that eliminating the exemption would expand the government's involvement since it would require, among other things, valuation of church properties,

tax liens and tax foreclosures. 397 *U. S.* at 674, 90 *S. Ct.* at 1414, 25 *L. Ed.* 2d at 704–705.

This case is not precisely analogous to any of the United States Supreme Court decisions dealing with entanglement. Those cases all involved some type of direct grant of materials or money to sectarian schools, or involved tax credits or rebates specifically directed to the aid of parents with children in such institutions. *See also Public Funds for Public Schools of N. J. v. Byrne,* 444 *F. Supp.* 1228 (D. N. J. 1978); *Public Funds for Public Schools of N. J. v. Marburger,* 358 *F. Supp.* 29 (D. N. J. 1973). In short, there was some significant effect on the public purse. Conversely, the only conceivable public expense in the East Brunswick scheme, as we have modified it, is a degree of wear and tear on school properties. Another common factor in the federal cases was the charge that continued entanglement between government and religion would tend to verge on government sponsorship of religion.

In *Meek v. Pittinger, supra,* a statutory provision authorizing public schools to loan teachers, equipment and materials for special services to parochial schools was invalidated. Since the sectarian schools were not to reimburse the public school system for the value of this aid, an expenditure of taxpayer funds was involved. Further entanglement was engendered in the continued surveillance required of the State to insure that religion would not become intertwined with the secular instruction. This result was found to constitute impermissible administrative entanglement. 421 *U. S.* at 369–372; 95 *S. Ct.* at 1765–1766, 44 *L. Ed.* 2d at 234–236. The Court also found entanglement in the appropriation process, which entailed an annual reconsideration of the Act. The Court concluded that

[t]he Act thus provides successive opportunities for political fragmentation and division along religious lines, one of the principal evils against which the Establishment Clause was intended to protect. See *Lemon v. Kurtzman,* 403 *U. S.* at 622–623, 91 *S. Ct.* 2105, 29 *L. Ed.* 2d 745. This potential for political entanglement, together with the

administrative entanglement which would be necessary to ensure that auxiliary-services personnel remain strictly neutral and nonideological when functioning in church-related schools, compels the conclusion that Act 194 violates the constitutional prohibition against laws "respecting an establishment of religion."

[421 *U. S.* at 372, 95 *S. Ct.* at 1766, 44 *L. Ed.* 2d at 236]

The instant case is distinguishable. No significant administrative function is involved. The processing of an application by a clerk is hardly an act of excessive entanglement. Moreover, inasmuch as no use of school premises is made during regular school hours, there is no need of supervision to insure that no religion seeps into secular instruction. The danger of political fragmentation is miniscule, as appropriations are not involved. The mere fact that some persons in the community oppose the use of the schools by sectarian groups should not prevent these groups from enjoying the benefits of premises which the tax dollars of many of their members helped to construct.

The scene envisioned by our Brother Clifford's dissent, see *post* at 134–135, of some harried local official beseiged by religious groups when the time for renewal of their leases arrives is imaginary. Equally inapposite is the dissent's cite from *Lemon v. Kurtzman, supra.* The basis for Chief Justice Burger's fear of political fragmentation in *Lemon* was ". . . the need for annual appropriations." 403 *U. S.* at 623, 91 *S. Ct.* at 2116, 29 *L. Ed.* 2d at 762. The situation in *East Brunswick* bears no relationship whatsoever to the concern of Chief Justice Burger. In *East Brunswick* the granting of a lease application is largely *pro forma* so long as the group involved has requested a time slot which does not conflict with school-related activities and which is not already filled by other nonprofit groups. It is more a ministerial than a discretionary determination. In his dissent, Justice Clifford admits as much, see *post* at 132–135. There is no evidence in the record which so much as implies that the allocation of school facilities when the buildings are not in use for regular educational matters has caused any divi-

siveness in *East Brunswick*. While this Court is well advised to examine the implications of its decisions, it is not warranted in assuming, *sua sponte,* the worst conceivable state of facts for every problem it encounters.

The storage of religious artifacts and books in school closets would seem to be a minimal accommodation by the school district. It certainly is not the type of extensive entanglement which was condemned by the Supreme Court in *Meek*. Of course, if it were shown that storage of these materials caused a shortage of closet space for school materials, such storage would be impermissible as an interference with public school education by religious groups. Without such a showing, or any indication that these artifacts are on prominent display while school is open, there is no constitutional infirmity in using some school closet space to store them.

Our only real concern under the entanglement test is with the lengthy use of these school premises by some of the religious groups. At some point, such continuous use will surely implicate the Board in the promotion of religion. However, notwithstanding the fact that several congregations have used school premises for a lengthy period of time, we do not intend to place a strict temporal limitation on use. In every instance, these religious groups have been diligently striving toward the procurement of their own houses of worship and instruction. However, we agree with the sentiments expressed by the Supreme Court of Florida in *Southside Estates Bapt. Church v. Bd. of Trustees, supra,* that truly prolonged use of school facilities by a congregation without evidence of immediate intent to construct or purchase its own building would be impermissible.[8] We

---

[8]The implication of Justice Clifford's dissent, see *post* at 122 is that the lease of school buildings for an indefinite period of time as opposed to a fixed time is tantamount to a lease for all time. This is incorrect. Permitting the lease to run for an indefinite period is merely a sensible accommodation to the well-known fact that a

leave it to our able trial courts to draw the line in this area, with the caveat that the continued leasing of East Brunswick school facilities from 1973 to the present by the Reform Temple is approaching the outer bounds of reasonable time and nearing the point of prohibited entanglement.

The fact pattern of this case indicates no intention of permanent use on the part of any religious group. In all probability, the fear of congregations using schools on a permanent basis will be a hollow one. The record, oral argument, and past practice indicate that the religious groups actively seek to be housed in their own place of worship. Unless they embark on a startling change in direction, we may safely assume that such groups will continue striving to grow and save so that at the first practicable moment they will have a home of their own.

We can only conclude that the facts of this case do not support a claim of excessive entanglement. Concededly, the use of the public schools by sectarian groups has no secular purpose on their part. However, there was no sectarian purpose on the Board's part. Public revenues are not involved; the secular aims of public education are in no way inhibited; and government supervision is quite unnecessary. Thus, we discern no reason to prohibit the use of school facilities by religious groups. While such use indicates at least a lack of disapproval on the part of the Board respecting the activities of these groups, it in no way constitutes an endorsement of their creed.

Perhaps the most important fact to remember is that contrary to the literal approach to the Establishment Clause advocated by plaintiff, in total disregard of historical reality, the Supreme Court has never required that government

---

multitude of unforeseeable problems routinely occur when land is purchased, plans are drawn, and construction of a building commences. The Establishment Clause is not offended simply because a lease for a fixed term, which would be impracticable under these circumstances, is not required.

adopt a posture of total indifference toward religion.[9] In fact, a more accurate assessment of the requirements of the First Amendment is that the preferred governmental stance in one of benevolent neutrality. Note, *Establishment Clause Analysis of Legislative Aid to Religion,* 74 *Colum. L. Rev.* 1175, 1176 n. 7 (1974). The Supreme Court has echoed this point:

> The course of constitutional neutrality in this area cannot be an absolutely straight line; rigidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited. The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. *Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.*
>
> [*Walz v. Tax Commission, supra,* 397 *U. S.* at 669, 90 *S. Ct.* at 1411, 25 *L. Ed.* 2d at 701–702; emphasis added]

Even Justice Black, for many years the most vigilant guardian against violations of the Establishment Clause, was never totally rigid. In *Everson v. Board of Education, supra,* where the Court upheld a New Jersey statute calling for publicly funded busing of students to parochial and public schools, Justice Black commented that

---

[9]In this vein, we find Justice Brennan's concurrence in *Abington School District v. Schempp, supra,* to be particularly illuminating.

> The State must be steadfastly neutral in all matters of faith, and neither favor nor inhibit religion. In my view, government cannot sponsor religious exercises in the public schools without jeopardizing that neutrality. On the other hand, hostility, not neutrality, would characterize the . . . denial of the temporary use of an empty public building to a congregation whose place of worship has been destroyed by fire or flood.
>
> [374 *U. S.* at 299, 83 *S. Ct.* at 1612, 10 *L. Ed.* 2d at 902]

Justice Brennan was careful to indicate that he was not requiring the government to so accommodate religious groups, but stressed that there is no constitutional prohibition to such accommodation.

\* \* \* [w]hile we do not mean to intimate that a state could not provide transportation only to children attending public schools, we must be careful, in protecting the citizens of New Jersey against state-established churches, to be sure that we do not inadvertently prohibit New Jersey from extending its general state law benefits to all its citizens without regard to their religious belief.

[330 *U. S.* at 16–17, 67 *S. Ct.* at 512, 91 *L. Ed.* at 724]

We have chosen to read behind the more strident exhortations of the Supreme Court concerning the famous "wall of separation," and to examine the actual results of the cases. In so doing, there emerges a line of decisions that is anything but straight and easily defined. In fact, it is notable that the Supreme Court in *Everson, supra,* emphatically quoted the "wall of separation" language of Thomas Jefferson exactly one page before holding that it was permissible for this State to bus children to parochial schools at taxpayer expense. 330 *U. S.* at 16, 17, 67 *S. Ct.* at 512–513, 91 *L. Ed.* at 723, 724. Significantly, Justice Black warned that "[s]tate power is no more to be used so as to handicap religions than it is to favor them." *Id.* at 18, 67 *S. Ct.* at 513, 91 *L. Ed.* at 725.

The East Brunswick scheme entails none of the dangers of the establishment of religion by government which the Constitution seeks to prevent. When one takes a calm look at the use of the school buildings there by religious groups, the dire predictions of sectarian sponsorship and political divisiveness conjured up by plaintiff seem rather silly.

We hold that religious groups who fully reimburse school boards for related out-of-pocket expenses may use school facilities on a temporary basis for religious services as well as educational classes. We further hold that the courts below erred in requiring these sectarian groups to pay a commercial rental rate and in placing the one-year limitation on their continued use of the school premises.

Subject to the requirement that taxpayers' funds not be expended for the benefit of religious groups, there is no

reason why these organizations should not be accorded the same treatment by government as other nonprofit groups.

Reversed.

CLIFFORD, J., dissenting. Today's opinion of the Court creates yet another fissure in the wall of separation between church and state. It does so, unmistakably and despite protestations to the contrary, by sanctioning the indefinite use of public school facilities for religious worship during non-school hours. While as a matter of public policy there is much to be said for the maximum use of public facilities by all segments of society, the statute, *N. J. S. A.* 18A:20–34, does not extend permission for such use and the United States Constitution forbids it. Our constitutional obligation to guard against excessive governmental involvement in religious affairs, however pure the motive therefor may be, is clear. Because I see today's decision as falling short of that obligation, I dissent.

I

As the Court's opinion recites, the East Brunswick Township Board of Education's rental program under scrutiny here provides for the leasing of public school facilities during non-school hours to various religious organizations as well as to other non-profit social, civic, recreational and charitable groups. Under the procedures established by the Board, a qualified association seeking to use the public school facilities submits an application directly to a local school administrator. The applicant is required to specify the intended use of the facility as well as the anticipated duration. The principal of the local school, guided by the regulations adopted by the Board, routinely grants such requests as long as the stated use does not conflict with school scheduling. While the rental charge varies according to the activity being conducted, there is no dispute that it is substantially less than the fair rental value of such facilities. Likewise

is there no dispute that while the requisite application may be submitted for use on a weekly, monthly, annual or indefinite basis, all of the religious bodies involved in the present case submitted applications requesting an indefinite use of the facilities.

Pursuant to this program the religious organizations in this case began in 1968 (Nativity Evangelical Lutheran Church), 1969 (East Brunswick Baptist Church), and 1973 (Reform Temple of East Brunswick) leasing school facilities for the various purposes set forth in the majority opinion. These included, with respect to one or the other or both of the two Churches, the use of classrooms on Sunday for religious services and religious instruction, as well as of limited classroom space on a weeknight for prayer meeting. Various religious artifacts, including bibles, hymnals, and a wooden pulpit with a cross, were stored in a closet or cabinet adjoining the area being utilized. It is noteworthy that the Nativity Evangelical Lutheran Church's initial leasing of school premises was intended to be of indefinite duration and the Board therafter approved yearly renewals. It no longer uses public school facilities. Likewise in the case of the East Brunswick Baptist Church the initial application was to rent the facilities for an "indefinite" period; it was treated by the Board as a request for use of the school space for one year and was granted; and the Board approved yearly renewals thereafter until the Church purchased its own building in the community. As regards the Reform Temple, it rented virtually an entire elementary school building for religious instruction for five hours on Sundays; a gymnasium for religious services and social gatherings on Friday evenings; and five classrooms for Hebrew language instruction on Tuesday and Thursday evenings. Religious articles used in these activities were also stored at the school. In its initial application the Temple sought to use the facilities for an indefinite period and the Board has renewed the Temple's application on a yearly basis. At the time of the commencement of this litigation the Temple had an option to purchase

a building site and had also retained an architect, but as of the time of oral argument the building had not yet been completed. We are informed that the Temple, after utilizing school facilities for some five years, recently discontinued using public school premises for any purpose, but that other church groups in East Brunswick are still using those facilities.[1]

Plaintiff, a taxpayer of East Brunswick, filed suit in Chancery Division seeking to enjoin the aforementioned use of public school facilities on statutory and constitutional grounds. Specifically, he asserted that the Board lacked the authority under *N. J. S. A.* 18A:20–34 (permissible uses of public school facilities) to permit such a use and, more importantly, that the practice itself violated the federal and state constitutions. The trial court held that while the Board lacked statutory authority under *N. J. S. A.* 18A:20–34 to permit the use of public schools by religious groups for worship services, the Sunday school and Hebrew instruction were permissible uses under the statute. *Resnick v. East Brunswick Township Board of Education,* 135 *N. J. Super.* 257, 261–62 (Ch. 1975). However, since the religious organizations did not fully reimburse the Board for the out-of-pocket expenses incurred as a result of their use of the facilities, the expenditure of public funds to meet these costs was held to violate

---

[1]Even though the matter might be considered moot because none of the religious organizations who participated in this litigation presently uses public school facilities, I agree with the Court that it is appropriate to reach the merits in the instant case. In view of the public importance attached to resolution of the issues and the likelihood of recurrence of the circumstances giving rise to this litigation, the case is properly allowed to proceed to decision. See, *e. g.*, *John F. Kennedy Memorial Hospital v. Heston,* 58 *N. J.* 576, 579 (1971) ; *Busik v. Levine,* 63 *N. J.* 351, 363–64, appeal dismissed, 414 *U. S.* 1106, 94 *S. Ct.* 831, 38 *L. Ed.* 2d 733 (1973) ; *Dunellen Board of Education v. Dunellen Education Association,* 64 *N. J.* 17, 22 (1973).

the New Jersey constitutional prohibition against public expenditures in support of religion. 135 *N. J. Super.* at 268; see *N. J. Const.* (1947), Art. I, ¶ 3.

The trial court held further that the renting of public school facilities at a reduced rate to religious groups on an *indefinite* basis violated the First and Fourteenth Amendments to the United States Constitution since

[t]he program involves entanglement between church and state, administrative entanglement in the record keeping and scheduling by defendant board's employees, and political entanglement in subjecting defendant board's members, elected officials, to the demands and pressures of religious bodies and of those opposing them to approve or disapprove leases for religious use of public school facilities.

[135 *N. J. Super.* at 268.]

Notwithstanding these entanglement problems the court declined to enjoin the rental practice and gave the Board 45 days within which to submit a proposal for continued use of the facilities for such fixed periods of time as would enable the affected religious bodies to secure alternative accommodations for religious services and religious instruction. The proposal subsequently submitted by the Board provided that religious organizations could continue to use public school facilities for religious education and services for one year on the condition that they pay the fair rental value of the facilities as well as any actual out-of-pocket expenses incurred as a result of such use. In addition, no religious artifacts were to be stored in the school. The proposal was modified slightly and embodied in the trial court's final order.[2]

The Appellate Division affirmed substantially for the reasons given by the trial court. *Resnick v. East Brunswick*

---

[2]Because plaintiff filed no cross-appeal from this final order, the issue of the propriety of its provisions is not presented. I would emphasize, however, that nothing in this opinion should be read to imply approval of the continued use, for one year, of school facilities for religious services.

*Township Board of Education,* 144 *N. J. Super.* 474 (App. Div. 1976).

The majority, in reversing the Appellate Division, approves the continued storing of religious artifacts and holds:

> [R]eligious groups who fully reimburse school boards for related out-of-pocket expenses may use school facilities on a *temporary* basis for religious services as well as educational classes. We further hold that the courts below erred in requiring these sectarian groups to pay a commercial rental rate and in placing the one-year limitation on their continued use of the school premises.
>
> [*Ante* at 120 (emphasis added).]

The Court thus takes the position, in effect, that the mere payment by the religious bodies of "related out-of-pocket expenses" somehow cures the constitutional defects presented by the indefinite use of public school facilities for religious worship and religious instruction. I think it does not.[3]

## II

Before the constitutional issues implicated by the Board's rental program are addressed, an initial determination must be made as to whether a local school board has the authority to permit public school facilities to be used for religious worship and religious instruction. As a general proposition the powers of a municipality are limited to those granted expressly or by necessary or fair implication of state legislation. *E. G., Ringlieb v. Parsippany-Troy Hills Township,* 59 *N. J.* 348, 351–52 (1971); see also 2 McQuillin, *Municipal Corporations* § 10.09 at 754–60 (3rd. ed. 1966). The powers of a local school board, *a fortiori,* are similarly

---

[3]There is no question as to the validity of the program as applied to the non-sectarian, non-profit organizations utilizing the facilities. Thus any finding that the program as applied to the religious groups utilizing the facilities is infirm would not affect the viability of the program as applied to the remaining non-profit organizations.

limited. See, *e.g., Botkin v. Westwood,* 52 *N. J. Super.* 416, 427 (App. Div.), appeal dismissed, 28 *N. J.* 218 (1958).

The applicable statute concerning the permissible uses of public school facilities during non-school hours, *N. J. S. A.* 18A:20–34, provides in pertinent part:

> The board of education of any district may, pursuant to rules adopted by it, permit the use of any schoolhouse and rooms therein, and the grounds and other property of the district, when not in use for school purposes, for any of the following purposes:
>
> a. The assembly of persons for the purpose of giving and receiving instruction in any branch of education, learning, or the arts, including the science of agriculture, horticulture, and floriculture;
>
> \* \* \* \* \* \* \* \*
>
> c. The holding of such social, civic, and recreational meetings and entertainments and such other purposes as may be approved by the board; \* \* \*

Pursuant to this enactment the Board adopted rules and regulations permitting the rental of its facilities by "any East Brunswick organization which is non-profit in nature" and whose "activities of an educational and/or cultural nature \* \* \* are of benefit to the community." As implemented the Board permitted the religious associations involved in the present case to lease the facilities for purposes of religious instruction and religious services. The threshold issue, then, is one of statutory construction, namely, whether *N. J. S. A.* 18A:20–34 authorizes the use of public school facilities for purposes of religious instruction and religious services.

While I agree with the Court that the language of subsection (a) of the statute is sufficiently broad to comprehend the instruction of religious tenets as well as the Hebrew language involved in the present case, the use of public school facilities for religious worship is not authorized under *N. J. S. A.* 18A:20–34(a) or (c). Subsection (a) refers generally to instructional activities and, as such, cannot fairly be read to comprehend the religious worship

services involved in this case, they being admittedly devoid of any pedagogical purpose. Subsection (c) provides that public school facilities may be used during non-school hours for "such social, civic, and recreational meetings and entertainments and *such other purposes as may be approved by the board.*" (Emphasis added.) The majority, in the course of holding that religious services are authorized under subsection (c), expansively interprets the emphasized language as affording a local board "wide discretion" in determining the permissible uses of school facilities. Ante at 99. That interpretation disregards settled principles of statutory construction and, in so doing, circumvents the presumed intent of the legislature in enacting *N. J. S. A.* 18A:20–34(c).

Under traditional canons of statutory construction where general statutory language follows specific words describing a legal subject, "the general words are construed to embrace only objects similar in nature to those objects enumerated by the specific words." 2A Sutherland, *Statutory Construction* § 47.17 at 103 (Sands ed. 1973); see also *Villanova v. American Federation of Musicians,* 123 *N. J. Super.* 57, 59 (App. Div.), certif. den., 63 *N. J.* 504 (1973). This sensible doctrine of *ejusdem generis,* which is invoked only when the meaning of statutory language is, as here, unclear, attempts to harmonize the apparent incompatibility between the specific and general statutory language in a manner which the legislature most likely intended. As applied to the present case statutory authorization for religious services may be derived from *N. J. S. A.* 18A:20–34(c) only if religious services are deemed to be similar in nature to "social, civic, and recreational meetings and entertainments." While the majority spins a beguiling semantical web in reasoning that religious services share the common characteristics of these enumerated permissible uses, the assemblage of persons offering worship to a deity according to established exercises and rituals is plainly different in nature. Moreover, the majority's expansive interpretation of "such other uses

as may be approved by the board" renders superfluous the uses specifically enumerated in subsection (c), thereby ignoring the recognized presumption that a legislature has not used superfluous words in drafting a statute. See Sutherland, *supra*, § 47.17 at 103.

Consequently, since *N. J. S. A.* 18A:20–34 does not authorize expressly or by fair implication the holding of religious services in public school facilities during non-school hours, I would agree with the courts below that the Board lacked the authority to permit such activity.

### III

But even were I of the view that *N. J. S. A.* 18A:20–34(c) authorizes the Board to permit religious worship in public school facilities, I would nevertheless overturn, on federal constitutional grounds, the rental program as applied to these religious organizations, including both the religious worship and the religious instruction.[4]

The religion clauses of the First Amendment, applicable to the States through the Fourteenth Amendment, provide that government "shall make no law respecting an establishment of a religion, or prohibiting the free exercise thereof." Since, as the majority likewise concludes, the rental of public school facilities by the religious groups involved in the present case did not implicate a free exercise question, *ante* at 105, the issue, then, is whether this practice violated the establishment clause.

The prohibition against the "establishment of a religion," growing out of a protracted colonial struggle for individual freedom of religion, reflects a societal aversion to varying types of noncoercive governmental intrusions into religious

---

[4]The rental program as applied to religious groups is also challenged on state constitutional grounds. See *N. J. Const.* (1947), Art. I, ¶ 4. Inasmuch as the program as applied is contrary to the establishment clause of the federal constitution, however, the state constitutional issue need not be reached.

freedom. Underlying the establishment clause are two fundamental social concerns:

(1) the furtherance of voluntarism by eschewing all governmental association with religion that may influence beliefs; and (2) the maintenance of neutrality by avoiding all manifestations of official preference for one religion over another or for religion over secularism.

[Note, Establishment Clause Analysis of Legislative and Administrative Aid to Religion, 74 *Colum. L. Rev.* 1175, 1175 (1974).]

In application the establishment clause requires government to adopt a posture of "neutrality" in its relations with religious groups. See, *e. g., Everson v. Board of Education,* 330 *U. S.* 1, 15–16, 67 *S. Ct.* 504, 511, 91 *L. Ed.* 711, 723 (1947). Over the years the rather amorphous requirement of governmental neutrality has been expanded into the following three-part test to be used in determining whether an enactment or practice runs afoul of the establishment clause: (1) it must have a secular legislative purpose; (2) a principal or primary effect of the practice must be one that neither advances nor inhibits religion; and (3) it must not foster excessive governmental entanglement with religion. *Wolman v. Walter,* 433 *U. S.* 229, 97 *S. Ct.* 2593, 2598–99, 53 *L. Ed.* 2d 714, 724–25 (1977); *Schaad v. Ocean Grove Camp Meeting Association,* 72 *N. J.* 237, 252 (1977).

Under this three-part test, the Board's practice of renting public school facilities to religious groups for an indefinite duration at less than the fair rental value must initially be examined to determine whether the threshold requirement — that the rental program have a secular purpose — is satisfied. Since there is no dispute that the purpose underlying the program before us is the optimum utilization of public school facilities during non-school hours by diverse groups within the community, the secular purpose requirement was thereby met.

As modified by the majority, however, this rental program raises serious constitutional problems under the second prong of the three-part test, since a primary effect is to confer significant benefits on any religious association utilizing the facilities. Under the majority's view such a group need reimburse the Board only for the "related out-of-pocket expenses" incurred. *Ante* at 120. Included expenses are the utility, heating, administrative and janitorial costs which would not be incurred but for the use of the facilities.

This nominal "rental fee" is significantly less than the rental value — $.75 per area hour — of the facilities. Hence it is apparent that the Board's policy of not assessing the fair rental value of the facilities allowed these religious organizations to realize a substantial financial savings. For instance, the Reform Temple saved approximately $2600 annually by not being assessed the fair rental value. Such governmental largesse, while doubtless motivated by concern for the well-being of all non-profit associations within the community, nevertheless has the undeniable effect of conferring a significant economic benefit upon a particular religious association[5] — precisely the evil which the establishment clause seeks to prevent.

Completely aside from the conferring of any financial benefit, the extensive use of public school facilities for

---

[5]The majority, in the course of holding that the program as applied does not have the impermissible effect of advancing religion, states that

> there is no question that incidental expenses of wear and tear on school property when used during non-instructional hours for religious worship and teaching as well as a myriad of other activities are not a public expense primarily for the benefit of religion.

[*Ante* at 112.]

This analysis misperceives the inquiry required by the second tier of the three-part establishment clause test. Under the second tier the impact of the program must be examined from the perspective of the *beneficiaries* of the program, not from that of the taxpayers who finance the facilities.

religious worship and religious instruction affords the religious bodies an otherwise unavailable public forum for expounding their tenets. That the use of public facilities for worship services over any substantial period allows access to a greater audience cannot be doubted. More importantly, however, the extent and duration of such use has the inevitable effect, at least in the minds of some, of placing the imprimatur of government upon religion in general. Indeed, the majority concedes as much when it notes that "[a]t some point, such continuous use will surely implicate the Board in the promotion of religion." *Ante* at 117. In my view that point was surely reached in the present case.

Thus, the program as applied conferred benefits both tangible and intangible upon the religious organizations utilizing the school premises. This practice over a substantial period had the undeniable effect of advancing religion contrary to the establishment clause. Yet the majority, while conceding that these religious bodies were benefitted by the rental program, contends that the program is not constitutionally infirm since whatever benefits may be received are simply an incidental effect of the program. *Ante* at 111. It reasons that *the* primary effect is to aid an internally pluralistic group of non-profit community organizations. Although unstated, the apparent rationale of this position is that while *a* direct effect of the rental program as applied may be to benefit religion, the program may not be overturned under the second tier of the three-part establishment clause test unless *the* primary effect is to advance religion. Since the program on its face benefits the community as a whole, so the argument goes, its effect is not impermissibly to advance religion.

But I think the effect is just that. The Supreme Court, in *Committee for Public Education & Religious Liberty v. Nyquist,* 413 *U. S.* 756, 93 *S. Ct.* 2955, 37 *L. Ed.* 2d 948 (1973), expressly rejected any such attempt to adhere rigidly

to the literal meaning of the second tier of the three part test:

> Appellees, focusing on the term "principal or primary effect" which this Court has utilized in expressing the second prong of the three-part test, e.g., Lemon v. Kurtzman, 403 U. S. 602, 612, 91 S. Ct. at 2105, 2111, 29 L. Ed. 2d 745, 755 (1971), have argued that the Court must decide in these cases whether the "primary" effect of New York's tuition grant program is to subsidize religion or to promote these legitimate secular objectives. Mr. Justice White's dissenting opinion [413 U. S. at 823, 93 S. Ct. at 2998, 37 L. Ed. 2d at 987], similarly suggests that the Court today fails to make this "ultimate judgment." We do not think that such metaphysical judgments are either possible or necessary. Our cases simply do not support the notion that a law found to have *a "primary" effect to promote some legitimate end under the State's police power is immune from further examination to ascertain whether it also has the direct and immediate effect of advancing religion.*
>
> > [413 U. S. at 785 n. 39, 93 S. Ct. at 2971, 37 L. Ed. 2d at 969 n. 39, (emphasis added).]

In analyzing the delicate issue of whether a governmental enactment or program has the impermissible effect of advancing religion, the Court wisely cautioned against an inflexible interpretation of the three-part establishment clause test, harking back to Chief Justice Burger's sage observation in Lemon v. Kurtzman, 403 U. S. 602, 614, 91 S. Ct. 2105, 2112, 29 L. Ed. 2d 745, 757 (1971):

> [C]onstitutional analysis is not a "legalistic minuet in which precise rules and forms govern." Instead * ** * "the form of the relationship [must be examined] for the light that it casts on the substance."
>
> > [413 U. S. at 790–91, 93 S. Ct. at 2974, 37 L. Ed. 2d at 972.]

Thus, under the approach called for in Nyquist, even if the primary effect of the rental program is legitimate, it may nevertheless run afoul of the establishment clause if a direct and immediate effect of the program is to advance religion. See L. Tribe, American Constitutional Law § 14–9 at 840 (1978). In the present case a direct effect of the rental program as applied was to afford the associations

in question a highly visible forum for advancing their religious tenets at a nominal price for an indefinite period. On this basis alone the program should be declared unconstitutional inasmuch as it had in this case — and hence continues to have, with respect to any future operation of the program, the potential for — an impermissible effect of advancing religion.

This result is buttressed by the failure of the rental program to satisfy the final component of the three-part test — whether the practice fosters excessive governmental entanglement in religious affairs. Plainly there must be involved a not insubstantial amount of record keeping and frequent communications between the Board employees and the religious bodies using the facilities concerning scheduling and the like. Moreover, by permitting any future users to store various religious artifacts and assorted paraphernalia on the school premises, the employees of the Board will be forced to exercise supervision order to ensure the safety of the items and avoid open display of the artifacts.

In addition, the potential political entanglement engendered by the rental of public school facilities on an indefinite basis or for any substantial period is equally manifest. The rules and regulations adopted by the Board provide that the principal of the school has broad discretion in granting or rejecting an application. In theory the principal is guided by the policies, rules and regulations of the Board in granting or denying an application. If these guidelines are not sufficiently detailed to aid in the disposition of an application, then either the Superintendent of Schools or the Board itself is called upon to make the determination. In any event, a local official, presumably well-known within the community, is given significant discretionary authority to grant or deny the application.

The political pressures which may be placed on such an official arise out of the necessity for decision not only on whether to grant or deny an application but also on whether to afford one religious body favored treatment over another

should a conflict arise by applicants seeking the same facility at the same time. Whether this potential political divisiveness along religious lines rises to the level of constitutional infirmity is, of course, a question of degree. In the present case the religious organizations use the facilities on an indefinite basis. However, since any indefinite use, as permitted by the program, may involve yearly renewals of the application, the political pressure exerted upon the official handling any other applications may be a recurring consideration. Although community opposition to the use of public facilities at reduced rental rates would not be sufficient, standing alone, to prevent such a use, a court cannot ignore the potential political divisiveness along religious lines engendered by this ongoing beneficent treatment of religious bodies. See *Johnson v. Huntington Beach Union High School District,* 68 *Cal. App.* 3d 1, 137 *Cal. Rptr.* 43, 50–51 (Ct. App. 1977), *cert.* den. 434 *U. S.* 877, 98 *S. Ct.* 228, 54 *L. Ed.* 2d 156 (1977) (potential divisiveness along religious lines implicated by a Bible study club using public school facilities during the school day "cannot be ignored" in an establishment clause analysis). As Chief Justice Burger has pointed out:

> Ordinarily political debate and division, however vigorous or even partisan, are normal and healthy manifestations of our democratic system of government, but political division along religious lines was one of the principal evils against which the First Amendment was intended to protect.
>
> [*Lemon v. Kurtzman, supra,* 403 *U. S.* at 623, 91 *S. Ct.* at 2116, 29 *L. Ed.* 2d at 761.]

And so I conclude that the rental of public school facilities to religious organizations at reduced rates for a substantial or indefinite duration not only has a primary or direct effect which advances religion in general, but also fosters excessive governmental entanglement in religious affairs. Consequently, under the three-part test for determining whether governmental action runs afoul of the

establishment clause, the rental program as modified by the majority is, in my respectful view, unconstitutional.

Nor is this conclusion undercut by *Southside Estates Baptist Church v. Board of Trustees*, 115 *So.* 2d 697 (Sup. Ct. Fla. 1959), where the Supreme Court of Florida held that the temporary use of public school facilities for religious worship did not violate the federal constitutional prohibition against the establishment of religion. Significantly, the court added this caveat:

[I]f the use of the school buildings were permitted for prolonged periods of time, absent evidence of an immediate intention on the part of the Church to construct its own building, we think it could hardly be contemplated that the public school system or its property could be employed in the permanent promotion of any particular sect or denomination.

[115 *So.* 2d at 700.]

Under Southside Estates, then, the use of school facilities for religious worship cannot be reconciled with the establishment clause if the use is prolonged and there is no immediate intention on the part of the religious body to construct its own facility. Here all the religious organizations used the facilities on an indefinite basis, up to seven years duration in two instances and 5 years in the other. That such use is the type of prolonged use referred to in *Southside Estates* cannot be doubted. While the majority takes the position that the second requirement of *Southside Estates* is satisfied since "every single religious group using East Brunswick schools has actively pursued plans to build its own house of worship", *ante* at 107 n. 7, I hesitate to adopt so indulgent a view in light of the record, sparse though it may be, indicating that the pursuit of building plans was anything but "active." Five to seven years is a leisurely pace, at best. In any event, *Southside Estates* is not persuasive authority for either position since, as noted, it was decided long before the formulation of the currently applicable three-part establishment clause test.

## IV

In summary, although the rental program is unquestionably valid as applied to non-sectarian charitable organizations and should be permitted to continue as to them, its application to religious groups runs afoul of both statutory and constitutional law. The Board has not been given the authority under *N. J. S. A.* 18A:20–34 to permit the use of public school facilities for religious worship. Even assuming such authority, the rental program fails to withstand scrutiny under the establishment clause. While the result may be looked upon as harsh, the necessity for the vigilant enforcement of the constitutional requirement of separation of church and state is particularly acute where, as here, public school facilities are transformed into houses of worship during non-school hours on a regular basis. As noted by Justice Frankfurter:

> Separation means separation, not something less. Jefferson's metaphor in describing the relation between Church and State speaks of a "wall of separation," not of a fine line easily overstepped. The public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny. In no activity of the State is it more vital to keep out divisive forces than in its school, to avoid confusing, not to say fusing, what the Constitution sought to keep strictly apart. "The great American principle of eternal separation" — Elihu Root's phrase bears repetition — is one of the vital reliances of our Constitutional system for assuring unities among our people stronger than our diversities. It is the Court's duty to enforce this principle in its full integrity.
>
> [*McCollum v. Board of Education*, 333 *U. S.* 203, 231, 68 *S. Ct.* 461, 475, 92 *L. Ed.* 649, 669 (1948) (Frankfurter, J. concurring).]

I would affirm the judgment of the Appellate Division. Judge Conford joins in this opinion.

Conford, P. J. A. D. (temporarily assigned), dissenting. I join Justice Clifford's dissenting opinion and add these comments.

If plaintiff were an appellant here I would vote to affirm the judgment of the Appellate Division only to the extent that it rejected the appeal of the Board of Education and I would vote to reverse that judgment to the extent that it approved provisional use of public school buildings for purposes of religious worship and religious instruction even though limited to a fixed period of time. In my judgment *any* use of publicly built and maintained buildings, especially public schools, for the stated purposes is antithetical to the fundamental principle of separation between church and state embedded in both the federal and State constitutions.

We are not confronted here with anything like the debatable questions of argued neutrality or secularism of purpose which have troubled the courts in such cases as *Wolman v. Walter,* 433 *U. S.* 229, 97 *S. Ct.* 2593, 53 *L. Ed.* 2d 714 (1977); *Lemon v. Kurtzman,* 403 *U. S.* 602, 91 *S. Ct.* 2105, 29 *L. Ed.* 2d 745 (1971); *Board of Education v. Allen,* 392 *U. S.* 236, 88 *S. Ct.* 1923, 20 *L. Ed.* 2d 1060 (1968); and *Everson v. Board of Education,* 330 *U. S.* 1, 67 *S. Ct.* 504, 91 *L. Ed.* 711 (1946). Here we have the raw undissembled turning over of publicly erected and maintained public buildings for purposes of straight religious worship and instruction. The authors of the Establishment Clause did not strive merely to assure that public authorities would exact fair compensation for the use of public buildings to conduct religious exercises therein, but rather to erase any vestige of sponsorship of religious practices in such buildings. It is particularly opprobrious to countenance violation of separatism in public schools where children are taught to respect the basics of our democracy, including that fundamental principle.

Here, as was said by the Supreme Court of the situation presented in *McCollum v. Board of Education,* 333 *U. S.* 203, 212, 68 *S. Ct.* 461, 465, 92 *L. Ed.* 649 (1948), "* * * the state's tax-supported public school buildings [are] used for the dissemination of religious doctrines"; and further,

that "* * * a state cannot consistently with the First and Fourteenth Amendments utilize its public school system to aid any or all religious faiths or sects in the dissemination of their doctrines and ideals * * *," *id.* at 211, 68 *S. Ct.* at 465. This is precisely, in my view, what the Court is sanctioning here. I dissent.

*For reversal*—Chief Justice HUGHES and Justices SULLIVAN, PASHMAN, SCHREIBER and HANDLER—5.

*For affirmance*—Justice CLIFFORD and Judge CONFORD—2.